**SUNRAY DX OIL COMPANY et al.,**
Petitioners,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Gulf Oil Corporation, Humble Oil & Refining Company, Texaco Inc., and Sun Oil Company, Intervenors in Nos. 8311, 8312, 8313, and 8314.

Nos. 7781, 8298, 8311–8317,
8358–8360, 8362.

United States Court of Appeals
Tenth Circuit.

Dec. 9, 1966.

William K. Tell, Jr., and William R. Slye, Cleveland, Ohio, for petitioners in Nos. 7781, 8298, 8315, 8316, 8358, 8359, 8360, and 8362, and for intervenors Gulf Oil Corporation, Humble Oil & Refining Co., and Texaco, Inc., in Nos. 8311,

8312, 8313, and 8314. With them on the briefs were:

Homer E. McEwen, Jr., and J. P. Greve, Tulsa, Okl., for Sunray DX Oil Co., petitioner in No. 7781;

Dixon Morgan and McAfee, Hanning, Newcomer, Hazlett & Wheeler, Cleveland, Ohio, and Richard F. Remmers, Oklahoma City, Okl., for Sohio Petroleum Co., petitioner in No. 8298;

James J. Flood, Jr., Houston, Tex., for Texaco, Inc., petitioner in No. 8315 and intervenor in Nos. 8311, 8312, 8313, and 8314;

Warren M. Sparks and Arthur F. Whitt, Tulsa, Okl., for Gulf Oil Corporation, petitioner in No. 8316 and intervenor in Nos. 8311, 8312, 8313, and 8314;

Wilmer D. Masterson, III, and Kilgore & Kilgore, Dallas, Tex., for Edwin L. Cox, petitioner in No. 8358;

Robert W. Henderson, Dallas, Tex., for Lamar Hunt, petitioner in No. 8359;

Carl Illig, Jesse H. Foster, Jr., and James K. Schooler, Houston, Tex., for Humble Oil & Refining Co., petitioner in No. 8360 and intervenor in Nos. 8311, 8312, 8313, and 8314;

Vernon W. Woods, Shreveport, La., for Union Producing Co., petitioner in No. 8362.

Phillip D. Endom, New Orleans, La., for Sun Oil Co., petitioner in No. 8317 and intervenor in Nos. 8311, 8312, 8313, and 8314. With him on the briefs were Robert E. May, Francis H. Caskin, and May, Shannon & Morley, Washington, D. C.,

Morton L. Simons, Washington, D. C., for petitioners in Nos. 8311, 8312, 8313, and 8314. With him on the briefs were:

William T. Coleman, Jr., and Robert W. Maris, Philadelphia, Pa., for United Gas Improvement Co., petitioner in No. 8311;

Samuel Graff Miller and Donald Blanken, Philadelphia, Pa., for Philadelphia Electric Co., petitioner in No. 8311;

Edwin F. Russell, Harry G. Hill, Jr., and Barbara M. Suchow, Brooklyn, N. Y., for Brooklyn Union Gas Co., petitioner in No. 8312;

Kent H. Brown, Albany, N. Y., for Public Service Commission of State of New York, petitioner in No. 8313;

Edward M. Barrett and Bertram D. Moll, Mineola, N. Y., for Long Island Lighting Co., petitioner in No. 8314.

Cyril S. Wofsy, Washington, D. C., for respondent. With him on the brief were Richard A. Solomon, General Counsel, Howard E. Wahrenbrock, Sol., and Joel Yohalem, Attorney, Federal Power Commission.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

BREITENSTEIN, Circuit Judge.

These petitions seek review of Opinion No. 422 [1] of the Federal Power Commission granting permanent certificates of public convenience and necessity under § 7 of the Natural Gas Act [2] for sales of natural gas produced in Texas Railroad District No. 4 to various interstate pipeline companies. Nine of the petitions are by independent natural gas producers, three are by distributing companies selling gas in the Atlantic Seaboard area, and one is by the Public Service Commission of the State of New York. All of the petitions are brought under § 19(b) of the Act.

The Commission fixed the rate at 16 cents per Mcf. The producers say that the rate is too low and the distributors say that it is too high. The parties are also at odds on the Commission treatment of the refund question. We affirm the 16-cent rate and hold that refunds of collections made in excess of that rate under temporary certificates containing no express refund condition may not be ordered.

The first petition for review was filed in the Tenth Circuit by Sunray DX Oil Company and other producers. After

1. 31 FPC 623.

2. 15 U.S.C. §§ 717–717w.

procedural skirmishes,[3] petitions for review of Opinion No. 422 pending in other circuits were transferred to the Tenth Circuit pursuant to 28 U.S.C. § 2112(a). The producers filed motions for leave to adduce additional evidence. These motions were deferred to the hearing of the petitions on the merits. The proceedings were held in abeyance for a time in anticipation of the decision in United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284.

An understanding of the issues will be helped by a brief recitation of the Commission actions and the court decisions which make up the background. The decision in Atlantic Refining Co. v. Public Service Commission of New York, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312, (CATCO) directed the Commission in certificate cases to keep initial prices in line. Thereafter, on September 28, 1960, the Commission promulgated its Statement of General Policy No. 61–1.[4] This was issued concurrently with Opinion No. 338 in Phillips Petroleum Company.[5] The Policy Statement established 23 rate areas, including District No. 4 involved herein, and with unimportant exceptions announced maximum rates for each area. In Phillips, the Commission held that the regulation of independent producers under the Act could be accomplished more appropriately by the establishment of area rates than by the establishment of producer rates on individual cost-of-service findings.[6] The Policy Statement established a guideline initial rate for District No. 4 of 18 cents per Mcf.

On August 30, 1962, the Commission issued Opinion No. 362 in Skelly Oil Co., 28 F.P.C 401. That proceeding involved applications under § 7 for permanent certificates covering sales of gas produced in District No. 4. Therein the Commission disposed of all applications under contracts executed prior to September 28, 1960, the date of the Policy Statement, by the imposition of a 15-cent initial price condition and deferred decision on sales under four contracts bearing a later date. On the same day as the Skelly decision, the Commission promulgated its Fifth Amendment to the Statement of General Policy No. 61–1, 28 FPC 441, reducing the guideline initial rate in District No. 4 from 18 cents to 16 cents effective the same date. The four applications which had been severed from Skelly were then consolidated with a number of applications covering District No. 4 sales under contracts made between September 30, 1960, the date of the Policy Statement, and August 30, 1962, the date of the Skelly decision and the Fifth Amendment. The consolidated proceedings went forward under the style Amerada Petroleum Corporation, et al., Docket Nos. C162 etc.

In its order for the consolidated hearing the Commission stated:

"In such a hearing all of the applicants will have an opportunity to show whether the appropriate price at which they should be permanently certificated should be limited to the 15-cent per MCF price which we found to be the in-line price as of September 28, 1960, the 16-cent price which is being adopted as the future area ceiling price for this area, or the 18-cent per Mcf price established on September 28, 1960."

The applications covered initial contract-based rates ranging from 15.9

3. See Amerada Petroleum Corporation v. Federal Power Commission, 10 Cir., 338 F.2d 808, and Sunray DX Oil Company v. Federal Power Commission, 10 Cir., 351 F.2d 395.

4. 24 FPC 818.

5. 24 FPC 537, affirmed State of Wisconsin v. Federal Power Commission, 112 U.S. App.D.C. 369, 303 F.2d 380, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357.

6. The first area rate proceeding was initiated by Commission order dated December 23, 1960, 24 FPC 1121, and culminated in Opinions Nos. 468 and 468–A filed in August and October, 1965, and now under review in this court. See Skelly Oil Company v. Federal Power Commission, No. 8385, and companion cases.

cents to 19.8 cents.[7] During the pendency of their applications for permanent certificates, numerous producers requested and received temporary authorizations under § 7(c) of the Act and § 157.28 of the Commission regulations thereunder.[8] These were issued ex parte and without notice or hearing. Many of the temporary certificates did not contain an express refund condition.

The Amerada proceedings before the Examiner went forward contemporaneously with the judicial review of the Skelly decision, Opinion No. 362. In Amerada the producers offered, and the Examiner declined to receive, testimony and exhibits covering economic and financial requirements. Texaco Inc. sought to obtain the disclosure and production of Commission records pertaining to the establishment of the guideline initial prices in the Policy Statement and the Fifth Amendment. This was denied. Review of the Commission actions upholding the Examiner on these two evidentiary issues was sought and denied in Texaco Inc. v. Federal Power Commission, 117 U.S.App.D.C. 268, 329 F.2d 223, certiorari denied 375 U.S. 941, 84 S.Ct. 346, 11 L.Ed.2d 272, on the ground that under § 19 the petitions for review were premature.

A Commission staff economist presented, and the Examiner received in evidence, Exhibit 16. This exhibit is a summary of price and other information for all District No. 4 contracts dated 1955 or later, filed as rate schedules with the Commission, and calling for a price of at least 14 cents.[9]

The Examiner's decision, issued July 23, 1963, recommended the grant of permanent certificates of public convenience and necessity to all producer applicants on specified conditions, two of which are pertinent here. The initial price was to be no greater than 15 cents per Mcf and no refunds were required of producers selling gas under temporary authorizations which did not contain any specific refund condition. Both the producers and the distributors filed exceptions to the Examiner's decision.

While the matter was pending before the Commission, the District of Columbia Circuit decided the Skelly case.[10] That decision affirmed the 15 cent in-line price established by Opinion No. 362 for District No. 4 sales under contracts made before September 28, 1960, and reversed the Commission holding that refunds could not be required when the temporary authorization contained no express refund condition.

By its Opinion No. 422, here under review, the Commission upset the Examiner on both the price and refund issues. It fixed the in-line price at 16 cents per Mcf and deferred the question of refunds under contracts having no express refund conditions.

With this background we first consider the rejection of the proffered evidence. Several producers jointly tendered testimony and exhibits covering economic and geologic factors pertinent to the area. The showing was that exploratory and drilling costs have substantially increased between the time when the majority of contracts in Skelly had been executed and the execution of the contracts with the prices here in dispute; that the public interest required further exploratory and drilling efforts in the area because of increasing demand and lessening supply; and that the public convenience and necessity required initial contract prices up to and

7. There was only one proposed price at 19.8 cents. The next highest was 18 cents. The proponent of the 19.8-cent price is not seeking review of the Commission action.

8. 18 C.F.R. 157.28.

9. The witness said that he excluded sales below 14 cents because "the 14 cent level is the lower suspension level of Commission Policy Statement 61–1."

10. Public Service Commission of the State of New York v. Federal Power Commission, 117 U.S.App.D.C. 287, 329 F.2d 242, certiorari denied sub nom. Prado Oil & Gas Co. v. Federal Power Commission, 377 U.S. 963, 84 S.Ct. 1644, 12 L. Ed.2d 735.

including 18 cents per Mcf. The Commission upheld the Examiner's decision to exclude the evidence because it was not relevant to a § 7 proceeding where the test is public convenience and necessity rather than the determination of a just and reasonable rate.

CATCO [11] holds that the Act does not require a determination of just and reasonable rates in a § 7 proceeding; that if a proposed price is "out of line" the Commission may impose conditions; and that to protect the public interest the Commission acts in a § 7 proceeding "to hold the line awaiting adjudication of a just and reasonable rate." CATCO does not define the "line" and does not fix standards by which a determination may be made of whether a price is "in line" or "out of line."

In Callery the Supreme Court said that under § 7 "adequate protection to the public interest requires as an interim measure that gas not enter the interstate market at prices higher than existing levels." [12] With reference to cost and economic trend evidence, the Court mentioned the experience of the Commission, said that the Commission "properly and constructively exercised its discretion in declining to consider this large quantity of evidence," and concluded that the rejection of such evidence is "an appropriate step" in the streamlining of Commission procedures. [13]

The producers seek to avoid the impact of Callery by the assertion that the proffered evidence was a streamlined presentation which could not cause any crippling delay. In our opinion, the admissibility of such evidence does not depend on any quantitative test. Relevance is determined by the substance of the offer. Although we agree with the producers that neither CATCO nor Callery establishes any specific evidentiary standards, the point is that the

just and reasonable rate standards of §§ 4 and 5 do not apply to § 7 where the test is public convenience and necessity. We do not say that economic and geologic evidence is never admissible in a § 7 proceeding. This may depend on varying circumstances. All we say is that in the posture of this case the Commission did not abuse its discretion by rejecting the evidence. [14]

By request to the Examiner and by application for a subpoena duces tecum and ad testificandum, Texaco Inc. sought to obtain the disclosure of the data and materials underlying and supporting the price levels for initial sales in District No. 4 as announced by the Commission in its Policy Statement and in the Fifth Amendment thereto. In sustaining the Examiner's denial, the Commission pointed out that the burden is on a producer-applicant to prove that a certificate is required by the public convenience and necessity; that the effect of the Texaco motion is to place on the Commission the burden of justifying the price expressed in the Policy Statement; and that Texaco had demonstrated no reason for the production of the documents and issuance of a subpoena as requested. Consideration of this problem is entwined with the intent and effect of the Policy Statement.

We have noted that the Policy Statement fixed an 18-cent price, that Skelly, Opinion No. 362, fixed a 15-cent price for the period prior to the issuance of the Policy Statement, that the Fifth Amendment to the Policy Statement fixed a 16-cent price, and that we are here concerned with contracts executed between the date of the Policy Statement and the date of the Fifth Amendment. The producers argue that the Policy Statement established an 18 cent in-line rate. The distributors contend that Skelly established a 15 cent in-line rate. None of the petitioners are happy with

11. 360 U.S. 378, 390–392, 79 S.Ct. 1246, 1255.

12. 382 U.S. 223, 227, 86 S.Ct. 360, 362.

13. Id. at 228, note 3, 86 S.Ct. 360, 363.

14. See Public Service Commission of the State of New York v. Federal Power Commission, 117 U.S.App.D.C. 287, 329 F.2d 242, 246–247.

the 16-cent rate which the Commission decreed.

The basic claim of the producers is that the Policy Statement set in-line prices on which they were entitled to rely. In our view this is a misconception of the Commission action. The Policy Statement is just what it purports to be—an ex parte statement issued without hearing by an agency to advise the public properly of the manner in which the agency proposes to exercise a discretionary power. Reference is made therein to "price standards" and "price levels." The purpose is that of "guidance and initial action by the Commission." The effect is that, "in the absence of compelling evidence calling for other action," producer applications for certificates proposing higher rates than those listed will be either denied or conditioned. The result is that the Policy Statement plays a "significant role" in arresting the upward trend of producer prices.[15]

■ The announcement of a guide to price levels or price standads is not the establishment of an in-line price. That is accomplished after notice and hearing in an appropriate proceeding—not in a policy declaration. No doubt designedly, the Commission did not specify the formula which it used in arriving at the guideline rates. Its failure to do so may put a burden on producers and distributors alike in any attempt to show that a guideline price should or should not be adopted as an in-line price. The presence of such burden neither requires nor permits a party to go back of the Policy Statement in search of its justification. That is the administrative concern of the Commission. It follows that the request and application of Texaco for the underlying data and materials were properly denied.

■ The Commission may not rigidly and arbitrarily impose a guideline price as an in-line price. The Policy Statement recognizes that compelling evidence may call for action other than granting a certificate at the guideline price. The point is that, in the context of the proceedings before us, the establishment in 1960 of the 18-cent guideline cannot be ignored by the Commission in arriving at the in-line price.[16] Its effect had to be, and was, evaluated by the Commission.

■ The other extreme of the dispute is the position of the distributors who say that the 15-cent price established in Skelly, Opinion No. 362, for contracts executed prior to the date of the Policy Statement is the in-line rate which is presumed to continue until a just and reasonable rate has been determined in an area rate proceeding.[17] We agree with the distributors that the in-line procedure is an interim device and is not intended to be a permanent method of producer regulation. It is a necessary device because of the complex and time-consuming processes incidental to the establishment of a just and reasonable rate.[18] The apparently inevitable time lag between certification and establishment of a just and reasonable rate affects the mutability of an established in-line price.

■ The Commission has recognized that the in-line price must reflect cur-

---

15. State of Wisconsin v. Federal Power Commission, 373 U.S. 294, 312–313, 83 S.Ct. 1266.

16. In Public Service Commission of the State of New York v. Federal Power Commission, 117 U.S.App.D.C. 287, 329 F.2d 242, 247, the court said: "The Commission could not have ignored altogether its own Policy Statement, but it was not required to be controlled thereby in deciding, in the Section 7 proceedings, that the in-line price should be fixed at a

less amount on the basis of the evidence analyzed in its opinion."

17. The just and reasonable rate for the sales certificated by the Commission in the order under review will be fixed in the Texas Gulf Coast Area Rate Proceeding, AR64–2, now in hearing before a Commission Examiner.

18. The Permian Basin Area Rate case was before the Commission for nearly five years. See supra note 6.

rent conditions.[19] The Courts of Appeals have agreed.[20] Further support is found in the Callery decision where the Supreme Court referred to "other contemporaneous certificates" and "prices higher than existing levels."[21] We concur with the Commission that once the in-line price is established it is presumed to continue not until the just and reasonable rate is determined but until "substantial evidence is presented that it has changed."[22]

Thus we reach the heart of the Commission's decision. The question is whether substantial evidence sustains the 16-cent price. All the petitioners say that it does not.

The basis for the Commission's action is Staff Exhibit No. 16 which lists the provisions of gas sales in District No. 4 "dated 1955 and later with total rates of 14.0¢ Mcf and higher as accepted for filing by the Federal Power Commission as of 8–31–62." The Commission analyzed the figures presented and compared the initial contract prices for the two years here under consideration with those pertinent to the Skelly proceeding where the 15-cent price was fixed for sales contracted before the date of the Policy Statement. It found that in the later period 82% of the gas moving in interstate commerce was at initial contract prices of 16 cents per Mcf and higher, and that the weighted average price for the period was 17.176 cents per Mcf. For the earlier period the weighted average was 16.5 cents. This shows an increase of more than six-tenths of a cent for the later period. The Commission pointed out that the lowest selling price for substantial quantities of gas during the period in question was 16 cents and concluded that the public convenience and necessity required the issuance of the certificates at that price.

The distributors argue that the Commission considered and acted on suspect prices. United Gas Improvement Co. v. Federal Power Commission, 9 Cir., 283 F.2d 817, 824, holds that it is an abuse of discretion for the Commission, in establishing a price line, to rely upon producer prices which are under review in pending court and Commission proceedings. In that case and the decisions of the Courts of Appeals which followed it[23] there were both numerous uncontested contracts available for consideration and certificates which the courts had rejected because of their issuance at excessive price levels.

The Examiner limited his consideration to sales under contracts which were made during the pertinent period and for which permanent certificates had been issued. The Commission found that the effect of this limitation was to arrive at an in-line price on the basis of only

19. See Opinion No. 362, Skelly Oil Company, 28 FPC 401, 408; Opinion No. 412, Hassie Hunt Trust, 30 FPC 1438, 1442; Opinion No. 436, Union Texas Petroleum, 32 FPC 254, 260.

20. In United Gas Improvement Co. v. Federal Power Commission, 9 Cir., 283 F.2d 817, 824, certiorari denied sub nom. Superior Oil Co. v. United Gas Improvement Co., 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191, the Court said: "As previously indicated, the price line is intended to reflect current conditions in the industry." See also Sohio Petroleum Company v. Federal Power Commission, 10 Cir., 298 F.2d 465, 467; and Atlantic Refining Company v. Federal Power Commission, 115 U.S.App.D.C. 26, 316 F.2d 677, 680.

21. 382 U.S. 223, 227, 86 S.Ct. 360.

22. Superior Oil Co., Opinion No. 437, 32 FPC 241, 243.

23. See United Gas Improvement Co. v. Federal Power Commission, 5 Cir., 290 F.2d 147, certiorari denied sub nom. Superior Oil Co. v. United Gas Improvement Co., 366 U.S. 965, 81 S.Ct. 1926, 6 L.Ed.2d 1255; Public Service Commission of State of New York v. Federal Power Commission, 109 U.S.App.D.C. 292, 287 F.2d 146, certiorari denied sub nom. Hope Natural Gas Co. v. Public Service Commission of New York, 365 U.S. 880, 81 S.Ct. 1031, 6 L.Ed.2d 192; United Gas Improvement Company v. Federal Power Commission, 10 Cir., 287 F.2d 159; and California Oil Co., Western Div. v. Federal Power Commission, 10 Cir., 315 F.2d 652.

1.39% of the volumes for all sales shown. In the UGI decision of the Ninth Circuit, mentioned above, the court said that the line "may properly be referenced to relevant existing producer prices under which substantial amounts of natural gas move in interstate commerce." [24]

Thus we have here a situation vastly different from that presented in the cases which have dealt with the suspect price doctrine. Exhibit 16 included the sales under consideration in the very proceedings in which the exhibit was presented. The distributors say that this is an impermissible bootstrap procedure. The producers in turn say that the reason for the small percentage of sales free from attack is the action of the distributors in contesting all sales above the price which is acceptable to the distributors.

In the determination of an in-line price, permanent certificates have a greater weight than do either temporary certificates or contract rates under attack. At the same time, when no appreciable volume of gas is moving under permanent certificates, the Commission has nothing upon which to base a decision as to in-lineness unless it turns to the temporaries. In fixing the 15-cent price for District No. 4 sales which preceded the Policy Statement, the Commission in Skelly gave a "limited degree of consideration" [25] to the price range of contracts resulting in temporary certificates although it recognized that they were not "as persuasive" [26] as permanent certificates. The price fixed in Skelly was upheld by the District of Columbia Court of Appeals which commented that the Commission gave "less consideration" to the temporary certificates than it did to the permanents.[27]

An in-line price is intended to reflect the price at which substantial volumes of gas are currently contracted for sale in interstate commerce. This determination cannot be made if all current sales are within the "suspect price" doctrine because of objections made to them. Such an application of the doctrine would, as said by the Commission, make the price determination dependent on the "unreviewable fiat" of the objectors. Our conclusion is that in the circumstances of this case the Commission did not abuse its discretion by the consideration given to prices not covered by permanent certificates.

The producers say that the in-line price for permanent certificates should be the highest price at which substantial quantities of gas move in interstate commerce and that here the Commission has fixed the lowest rather than the highest price.[28] The producers rely on the statement in Callery that: [29] "We believe the Commission can properly conclude under § 7 that adequate protection to the public interest requires as an interim measure that gas not enter the interstate market at prices higher than existing levels." This language does not mean that the public interest is not protected if the sales are approved at less than existing levels.

The distributors point to the decision in Atlantic Refining Co. v. Federal Power Commission, 115 U.S.App.D.C. 26, 316 F.2d 677, 679, which says that "if the Commission is to err in setting an initial rate, it should err on the low side" because of the right of a producer to file immediately for a rate increase under § 4. From this premise they argue that the 15-cent price of Skelly should have been adopted. The provisions of § 4, although they may not be disregard-

24. 283 F.2d 817, 823.

25. 28 FPC 1065, 1068.

26. 28 FPC 401, 409.

27. Public Service Commission of the State of New York v. Federal Power Commission, 117 U.S.App.D.C. 287, 329 F.2d 242, 245–246.

28. The opinion of the Commission says: "The record makes it clear that the lowest price at which substantial volumes of new gas were sold in interstate commerce in the area during the period in question was 16 cents per Mcf." 31 FPC 623, 637.

29. 382 U.S. 223, 227, 86 S.Ct. 360, 363.

ed, are not a complete answer. Rate increases filed thereunder are subject to suspension. The producers may have the use of the money collected but it is at interest if refunds are ordered and royalty and tax payments have to be made on the total amount collected. If the just and reasonable rate as finally determined is greater than the in-line rate adopted, the producers have no way of recouping their losses.[30] Our view is that the possibility of filings for increased rates under § 4 does not require that the Commission fix the price in a § 7 proceeding at a figure lower than that at which substantial volumes of gas are currently contracted for sale in interstate commerce.

Both producers and distributors attack the 16-cent price on the ground that it results from an improper use of, and reliance on, agency expertise. For over 12 years since the decision in Phillips Petroleum Company v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, the Commission has been struggling to regulate the independent natural gas producers under an act which is not well designed for the attainment of that objective. Serious administrative problems have developed. Procedures and methods have changed from time to time. Whether those now in use will receive full judicial approval remains to be seen. In the economic regulation with which the Commission is concerned the experience of the past must be projected into the future. The importance of expertise may not be downgraded. A delicate balance must be maintained between producer and consumer interests if the continued life of the industry is to be assured.

█ We have noted that an in-line price continues until substantial evidence shows a change. The producers point out that the Commission controls the variables which would result in a change

by rejecting evidence both of producers' costs and of initial prices which it considers suspect. The potential for circuity of action does not impress us too much. The cost evidence has been refused because it goes to the just and reasonable rate issue. In a § 7 proceeding the test is public convenience and necessity and evidence relevant thereto should be received. In the applications before us this evidence, in large measure, has taken the form of a showing of contract-determined initial prices. The Commission has given consideration to prices under temporary authorizations and under permanent certificates. Greater weight has been given to the permanent than to the temporary certificates. Some prices have been discounted as too high and some as too low. We believe this is proper. Here, at least, the result reached has not come from the use of a crooked yardstick.

The analysis and use of field prices established by producer-pipeline contracts require expertise. Objections to the use of weighted averages are not well taken. Such averages are necessarily lower than the highest prices paid. At the same time nothing is wrong with the use of weighted averages to compare price levels. Here the Commission has made such comparisons. These are proper as long as the action is not capricious or arbitrary.

█ It is apparent that in the case at bar the Commission was confronted with a difficult situation. CATCO tells it to hold the line. The Ninth Circuit UGI decision [31] says that the price line is intended to reflect current conditions and that the prices on which it is based must be those under which substantial quantities of gas move in interstate commerce. Various decisions warn against the use of suspect prices. Because of objections to most pertinent certificate applications, the number of permanent

---

30. An example is found in the pending Permian Basin Area Rate proceedings. The Policy Statement fixed the guideline price at 16 cents but the just and reason-

able rate for new gas sold under contracts dated after January 1, 1961, was fixed at 16.5 cents.

31. 283 F.2d 817.

certificates available for comparison purposes represents only a meager amount of gas. The Commission took due note of all factors and concluded that the price required by public convenience and necessity is 16 cents. We believe that in so doing the Commission acted reasonably and that "we owe it the same deference to its expertise that courts generally owe to the specialized boards and commissions created by the Congress to deal with complex and difficult problems in the field of economic regulation" [32] We find no abuse of discretion and affirm the 16-cent price.

The path from the morass of in-line prices leads directly to the thicket of refunds. Here again the traveled way is not well marked and we have a three-way disagreement among the parties over the route to be followed.

In the consolidated proceedings before the Commission, 27 of the 35 dockets related to applications in which temporary certificates had been issued without any express refund condition.[33] The Examiner held that on the authority of Opinion No. 362, Skelly, he had no power to order refunds when the temporary certificate did not contain an express refund provision. While the proceedings were pending before the Commission on exceptions, the District of Columbia Circuit reversed the pertinent holding in Opinion No. 362.[34] On the authority of that decision the Commission reversed the Examiner on the refund issue and held that "the public interest would best be served by deferring for the present the decision whether refunds should be ordered * * *, and if so, the extent of such refunds." The Commission said that the parties "will be given an opportunity to submit further briefs on the issue of refunds."

At the outset we are met by the Commission argument that the refund issue is not now reviewable because § 19(b) makes aggrievement a jurisdictional prerequisite to review of Commission orders and here aggrievement is absent because no refunds have been required. In denying the Commission motion to dismiss the Sunray petition [35] we held that Sunray was likely to suffer injury by the determination of the in-line price and that the threat of refunds made it an aggrieved party.

The threat has been followed by action. On July 27, 1966, the Commission issued Opinion No. 501 in the Amerada consolidated dockets which were considered in Opinion No. 422 here under review.[36] Opinion No. 501 says that the producers therein listed "will be ordered to make refunds of all amounts collected in ex-

**32.** People of the State of California v. Federal Power Commission, 9 Cir., 353 F.2d 16, 23. See also Charleston & Western Carolina Railway Company v. Federal Power Commission, 98 U.S.App.D.C. 241, 234 F.2d 62, 64.

**33.** In the remaining 8 applications a typical authorization is conditioned upon the refund to purchasers of "any amounts collected plus interest at 7 percent per annum in excess of 15.0 cents per Mcf which may be determined to be in excess of the price required by the public convenience and necessity."

**34.** Public Service Commission of the State of New York v. Federal Power Commission, 117 U.S.App.D.C. 287, 329 F. 2d 242, certiorari denied sub nom. Prado Oil & Gas Co. v. Federal Power Commission, 377 U.S. 963, 84 S.Ct. 1644.

**35.** Sunray DX Oil Company v. Federal Power Commission, 10 Cir., 351 F.2d 395,

400. The position of Sunray is important because all other petitions to review are transfers from other circuits.

**36.** This opinion was called to our attention during the argument of the South Louisiana cases, our Docket Nos. 7912 etc., Pan American Petroleum Corporation, et al. v. Federal Power Commission. We also have pending before us Docket No. 9000—Skelly Oil Company v. Federal Power Commission—which seeks review of Commission Opinion No. 492. A court may take judicial notice of its own records. Dial v. Johnson, 104 U.S. App.D.C. 32, 259 F.2d 189, 190. Although Opinions Nos. 492 and 501 were issued after the case at bar had been argued orally and submitted for decision, they are not controverted and the demands of justice require that we notice them. See Ellis v. Cates, 4 Cir., 178 F. 2d 791, 793, certiorari denied 339 U.S. 964, 70 S.Ct. 999, 94 L.Ed. 1373.

cess of 16 cents per Mcf while operating under temporary certificates" with the exception of certain royalty and tax payments not pertinent here. The producers listed include Sunray and six others who are petitioners in these proceedings. They are required to report their excess collections and hold them subject to the further order of the Commission "directing the disposition of those amounts."

 Opinion No. 422 as implemented by Opinion No. 501 adversely affects Sunray and the other six producers. Although payment itself is not yet required, the producers are told that the excess collections do not belong to them. The only thing which remains to be decided is the question of who gets the money and under what conditions. This is not a case like either Texas Eastern Transmission Corp. v. Federal Power Commission, 5 Cir., 357 F.2d 232, or United Fuel Gas Company v. Federal Power Commission, 4 Cir., 367 F.2d 34. They related to an order directing that refunds generated by a settlement agreement be retained by the producer pending Commission inquiry into whether release of the refunds to the pipelines would be proper. There the obligation to refund was fixed by the settlement. Here the obligation to refund is fixed by a Commission order. A producer has a right to a prompt determination of its liability. We believe that the question of the power of the Commission to order refunds of amounts collected under temporary certificates containing no express refund condition is ripe for determination and that proper judicial administration requires that it be deferred no longer.

Temporary certificates are issued ex parte and without hearing under § 7(c) of the Act in accordance with Commission Regulation § 157.28(c).[37] A party aggrieved by the issuance of such certificate has the right to judicial review.[38] The first attack on the absence of an express refund condition in the temporaries here under consideration came when the distributors, during the pendency of the proceedings before the Examiner, moved for the termination of the temporaries or in the alternative for a floorless refund condition. The Commission denied the motion. It declined to impose the refund condition because "we think clearly this would not be a proper action for us to take here." It further said that such action "would so denature the value of a commission authorization as to place any reliance upon our actions in this area in serious jeopardy" and that "we find it would be contrary to the public interest, as well as inequitable, to condition the temporary certificates" as requested by the distributors. The distributors did not seek review. We do not accept the producers' view that the unreviewed denial of the motion irrevocably determined the refund issue. The Commission could change its mind. At the same time the reasons given for the action are most compelling and show mature consideration of the problem.

The distributors emphasize the importance of refunds to the protection of the consumer interests. This may be conceded to the extent that refunds are passed down to the ultimate user. These benefits must be weighed against the desirability of the maintenance of an adequate supply of gas. A repricing of the gas, without warning, cannot help but have a severe impact on the operations of the producers. We will not speculate on the effect of such repricing on their exploration and development activities. The benefits derived from such costly activities may or may not be of greater value, from the public stand-

---

37. 18 C.F.R. § 157.28(c). Public Service Commission of the State of New York v. Federal Power Commission, 117 U.S. App.D.C. 195, 327 F.2d 893, 896, upholds the applicability of § 7(c) to independent producers and the validity of the regulation.

38. Id. at 895. The Court there held that the New York Public Service Commission had the right to petition for the review of an order granting a temporary certificate.

point, than the few dollars recovered by the home consumer. Perhaps he would rather have an assured supply for his expensive appliances than a modest refund. In any event the record does not purport to cover such issues and we turn to the decisions which the parties say control the outcome.

In our opinion the Callery decision [39] does not dispose of the issue presented here. The Supreme Court was there concerned with South Louisiana prices which had been the subject of much litigation.[40] The Court recognized that the Commission may not make reparation orders but said that "it is not so restricted where its order, which never became final, has been overturned by a reviewing court" and that "judicial review at times results in the return of benefits received under the upset administrative order." [41] The situation here is different. This is the first judicial review of the prices under consideration and we uphold the Commission on its in-line rate.

In Sunray Mid-Continent Oil Company v. Federal Power Commission, 10 Cir., 270 F.2d 404,[42] Sunray applied for temporary authority which was granted on the condition that an undertaking be filed "to assure refund of any portion of the difference, if any, between the proposed initial price of 16.4¢ per Mcf and the level of any price which the Commission may lawfully find to be required by the public convenience and necessity." We pointed out that Sunray was required "to speculate" as to what the rate might be and was denied "its right to have the Commission act upon its application with such certainty as to allow the exercise of choice upon Sunray's part." [43]

We have noted that Commission Opinion No. 362 pertaining to District No. 4 sales made under contracts executed prior to September 28, 1960, was set aside by the District of Columbia Circuit on the refund issue.[44] The Court there held that the "power [to order refunds] does not depend upon an explicit refund provision in a temporary certificate." [45] The Court went on to say that the exercise of the power was not "mandatory" and that the "refund issue requires further development and fuller consideration of the equitable factors other than those thought to flow from the mere absence of an explicit refund condition in the temporary certificates." [46]

The Court quoted the general language of the temporary certificates [47] that "acceptance for filing shall not be construed as constituting approval of any rate" and that authorization and acceptance of the rate schedule "are without prejudice to such final disposition of the certificate application as the record may require." It then concluded that "all else aside" these provisions authorize the condition-

39. United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360.

40. See CATCO, 360 U.S. 378, 79 S.Ct. 1246, and Public Service Commission of the State of New York v. Federal Power Commission, 361 U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237, reversing United Gas Imp. Co. v. Federal Power Commission, 269 F.2d 865. See also cases cited supra note 23.

41. 382 U.S. 223, 229, 86 S.Ct. 360, at 363.

42. The Sunray Mid-Continent case considered two consolidated petitions for review. We are here concerned with No. 6061.

43. 270 F.2d 404, 408–410.

44. The Supreme Court denied certiorari to review the District of Columbia Circuit decision. See Prado Oil & Gas Co. v. Federal Power Commission, 377 U.S. 963, 84 S.Ct. 1644. Denial of certiorari "imports no expression of opinion upon the merits of the case." United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182, 67 L.Ed. 361, and Pan American Petroleum Corp. v. Federal Power Commission, 10 Cir., 352 F.2d 241, 243.

45. 329 F.2d 242, 249.

46. Id. at 250.

47. This language is quoted in 329 F.2d 242, 249 and is the same as that found in the temporary certificates which are in the record before us and which do not contain express refund conditions.

ing of a permanent certificate by a refund requirement.

In our opinion these provisions mean that the Commission is not binding itself, by the issuance of a temporary certificate, to issue an identical permanent certificate of prospective effect after a hearing.[48] In its denial of the distributors' motion for refund conditions the Commission gave no recognition or effect to such provisions. We believe that the Commission intended the routine, boiler-plate language to have a purpose entirely different from that of an express refund condition.

When a producer dedicates its gas to interstate commerce, "there can be no withdrawal of that supply from continued interstate movement without Commission approval."[49] If the language mentioned means that a producer accepting such certificate without express refund conditions dedicates its gas without any floor on the rate, the producers have taken many uncalculated and uncalculable risks. We suggest that for the good of the public, the consumers, the distributors, the pipelines, and the producers certainty and stability are of prime importance.

▬▬▬ The situation in the case at bar differs from that presented to the District of Columbia Circuit. The proceedings there involved § 7 applications for permanent certificates covering District No. 4 sales under contracts executed before the issuance of the Policy Statement. Here we are concerned with sales under contracts made between the date of the Policy Statement and the date of

the Fifth Amendment. For that period the guideline initial rate was 18 cents. The temporary certificates with which we are concerned were issued "at prices not exceeding 18¢ per Mcf."[50] The 18-cent figure is significant and meaningful.[51] It resulted from the exercise of Commission expertise. When the producers dedicated their gas under temporary certificates permitting the collection of prices up to 18 cents without express refund obligation, they were entitled to rely on them. They were entitled to rely on the prior decisions of the Commission declining to order refunds of collections under unconditionally authorized temporary certificates.[52] For a period of several years the producers have sold their gas without warning that refunds would be required upon the grant of a permanent certificate. We believe that when a producer dedicates its gas to interstate sales it is entitled to know with some degree of certainty the conditions imposed so that it may make an intelligent decision whether to accept or reject the certificate. Such was our holding in Sunray Mid-Continent and we adhere to it. In our opinion, absent the special considerations recognized in Callery, refunds may be ordered under § 7 only when a producer contractually undertakes to make such refunds by the acceptance of a temporary certificate containing an express refund condition.

The motions to adduce additional evidence are severally denied. The cases are all remanded for further proceedings consistent with this opinion.

**48.** Included in the dockets considered by the Commission in this consolidated proceeding was No. C162–276 in which a temporary certificate was issued to, but not accepted by, Sun. It contained a definite refund obligation covering collections at a rate above 15 cents per Mcf and the provision that: "This temporary certificate and the acceptance of the above rate schedule are without prejudice to such final disposition of the application for certificate as the record may require." The inclusion of this routine language could not mean that the ex-

plicitly floored refund obligation became floorless.

**49.** Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 156, 80 S.Ct. 1392, 1403, 4 L.Ed.2d 1623. See also § 7(b) of the Act.

**50.** See Opinion No. 501.

**51.** See Sohio Petroleum Company v. Federal Power Commission, 10 Cir., 298 F.2d 465, 468.

**52.** See dissenting opinions of Commissioner O'Connor in Opinions Nos. 492 and 498.

SETH, Circuit Judge (dissenting in part):

I respectfully dissent on the issue of the "in-line" price because the Commission, in its determination of this issue in the consolidated cases here on review, has adopted a new concept of "in-line" which constitutes too wide a departure from prior usage and practice and from the authorities to be approved.

The Commission has here divided the range of prices into several segments, and has announced that the price here to be certificated is the lowest segment, " * * * the lowest price at which substantial volumes of new gas were sold in interstate commerce. * * *" The Commission is very candid in its selection of this lowest price. Its findings and its comments on the evidence show that a higher price would otherwise follow. For example, the Commission stated that the evidence " * * * points in the direction of a higher price * * *," than 16 cents which was the price here adopted. The Commission also said: "Our decision herein draws the line substantially below the average going price for gas in the area and in fact, two cents per Mcf below the Commission's guideline ceiling price prevailing at the time these contracts were executed."

The Commission also found that only a price above 18 cents " * * * would have an adverse impact on the pricing structure in the area."

The selection of the lowest segment is explained by the Commission in its opinion where it states: "In the final analysis our action in fixing the price at which these sales should be certificated requires an exercise of our informed judgment and utilization of the expertise developed in the handling of thousands of producer certificate applications."

To provide some factual material on this particular issue, reference should be made to the evidence upon which the Commission placed its principal reliance, if not its sole reliance. This consisted of the following:

1. The Commission's Statement of General Policy No. 61–1, September 28, 1960, 24 F.P.C. 818, announcing an 18 cent guideline price.

2. The Fifth Amendment to Statement of General Policy No. 61–1, August 30, 1962, 28 F.P.C. 441.

3. Staff Exhibit No. 16, admitted at the hearing, which consisted of a summary of field prices under contracts executed between January 1, 1955, and August 31, 1962, for sales in Texas Railroad Commission District No. 4 on file with the Commission and having a total initial rate of 14 cents per M.c.f. This exhibit included permanent certificates, temporary certificates, and the sales which were in issue in the consolidated proceedings.

Of the above several exhibits, the Commission considered Staff Exhibit No. 16 as the most important. The opinion of the Commission with reference to this exhibit, and to the period in issue, shows the following:

1. The weighted average price by volume was above 17.178 cents.

2. Eighty-two per cent of the gas sold was at 16.0 cents *and above*.

3. Seventy-one per cent of the gas was being sold at 17.0 cents *and higher*.

4. The table in the Commission's opinion with reference to this Exhibit also shows that twenty-seven per cent of the gas was sold at 16 cents *and below* and twenty-eight per cent at 16.5 cents *and below*.

The Commission found that 16 cents was the "in-line" price and stated, as referred to above, " * * * the record makes it clear that the lowest price at which substantial volumes of new gas were sold in interstate commerce in the area in the period in question was 16 cents per M.c.f."

The use in the text of the opinion of the term "and above" in the finding that eighty-two per cent of the gas passed at 16 cents and above appears to be somewhat unusual in view of the Commission's selection of the lowest price. It would appear that the reference to per-

centages or quantities of gas would instead include the amounts which passed at a figure of 16 cents or less. The opinion itself shows that some ten per cent of the gas was sold *at 16 cents*, some eleven per cent of the gas was sold at 16 cents to 16.5 cents, inclusive, and twenty-seven per cent at 16 cents *and below*.

As stated above, it is however not necessary to demonstrate by the figures that the Commission selected the lowest segment by reason of their recitation that they were so doing. In this consideration it should also be borne in mind that the Commission also found that there would be no adverse impact on the pricing structure in the area except by a price above 18 cents.

There would seem to be no question but what an "in-line" price is to be determined on the basis of contemporaneous certificates as stated by the Supreme Court, and on contemporaneous contracts where necessary. This price must represent the prevailing current conditions as the Commission states in its opinion. United Gas Improvement Co. v. Federal Power Comm'n, 283 F.2d 817 (9th Cir.). The Supreme Court has clearly stated that the "in-line" price is a device which will prevent gas from entering the interstate market "* * * at prices higher than the existing levels * * *"; and "* * * [c]onsumer protection is afforded by keeping the 'in-line' price at the level where substantial amounts of gas have been certificated to enter the market under other contemporaneous certificates, no longer subject to judicial review or in any way 'suspect.'" United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360. Also "where the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in the triggering of general price rises. * * *" Atlantic Refining Co. v. Public Service Comm'n, 360 U.S. 378, 79 S.Ct. 1246.

The Commission in its determination of the "in-line" price in this case by an adoption of the lowest price departed from the "current conditions test," and the "existing levels test," referred to by the Supreme Court. This departure represents a basic change in policy, and is not just a difference in what quantity may constitute a "substantial quantity." The Commission did not base its decision on such a distinction. It clearly and candidly selected the lowest segment of the price range. The Supreme Court in its references to current conditions can only mean the prevailing or predominant conditions existing in the area and cannot mean the lowest or the highest of the prices, for such are not typical or prevailing prices. In common usage something "in-line" is in conformance with other persons or things; it is, to borrow a phrase from the civil rights vocabulary, "in the mainstream"; it is a "prevailing price," a "going rate." It is not of the extreme in any direction, it is not the widest, the longest, the lowest, or the highest.

The Commission properly used the permanently certificated prices, and the temporary certificated prices, including the prices in issue here. I agree with the majority that these contracts or prices elsewhere referred to as "suspect" must be used in this case. They must be used for all purposes. This was the only data available for a realistic consideration of the issues, the economic data of the petitioners having been excluded. The Commission considered all the certificates in order that it could have before it a "substantial quantity" of gas. It rejected the examiner's limited consideration with the following language:

"Examination of the staff exhibit reveals that the permanently certificated sales considered by the examiner in fixing the 'in-line' price amount to only 1.39 per cent of the volumes for all sales shown and to no more than 2.05 percent of the sales permanently certificated in the District contained in the exhibit.'

and

"* * * In such circumstances it can hardly be maintained that the 'in-

line' test of the 'prices under which a substantial amount of natural gas presently moves in interstate commerce' has been fully met by the examiner. In our opinion it would be manifestly improper to base an 'in-line' price upon the initial prices permitted in these few isolated and inherently nonrepresentative sales whose total volume does not even begin to approach the amount of natural gas production involved in these dockets."

Thus all were considered to attain a sufficient volume, and the Commission did not and could not then disregard the temporary certificates on the price issue. Nor did the Commission state in its opinion that the temporary certificates were to be given less weight in its determination in this case. There is also no indication that they were given less weight other than the arguments in the briefs. The Opinion of the Commission in its explanation as to why the temporary certificates should be considered referred to its Texaco Seaboard case, 29 F.P.C. 593, where it said permanent certificates are decidedly more persuasive than are temporary, but continued " * * * this does not thereby render temporary authorizations *per se* inadmissible." The Commission then said:

"The soundness of this principle is readily apparent when viewed in the light of the facts before us, where, absent the ability to consider these authorizations, we would not be basing our decision upon 'substantial volumes of gas moving in interstate commerce.' "

The Commission then refers to the examiner's consideration quoted above. These references are only to *what* should be examined.

Thus the Commission considered the very large proportion of gas passing under temporary certificates, but did not state that this should receive less consideration or be given less weight than that permanently certificated. The Commission only stated:

"We believe that the fact that the great bulk of the gas moving in interstate commerce in the area during this period was contracted for and temporarily authorized at initial rates between 16 and 18 cents per Mcf must be considered in fixing the 'in-line' price for this period. Refusal to consider the temporarily authorized prices, in the circumstances of this proceeding, and reliance only on the few permanently certificated prices can only result in a complete stagnation of prices at the 'in-line' level initially determined for this District, a level based on prices being paid for gas under contracts drawn up long before these contracts were executed."

Thus from what is said in the Opinion, it cannot be concluded that the Commission has given less weight to the prices in the temporary certificates. With the minute percentage of the volumes considered being permanently certified, it would indeed require that the temporary certificates be virtually disregarded to explain a 16 cent price, and there is no indication that the Commission did so.

The Supreme Court has repeatedly said that the prices added as conditions to certificates under Section 7 do not constitute initial pricing by the Commission. Federal Power Comm'n v. Hunt, 376 U.S. 515, 84 S.Ct. 861, 11 L. Ed.2d 878. Thus the Commission is to set a price in the public interest and in line with current conditions in the area, not what the Commission thinks is just and reasonable or to be on the "safe side," one way or the other, for that would clearly be initial pricing. The selection here by the Commission of the "lowest price" by the exercise of its expertise is initial pricing because it is not and does not purport to represent "current conditions."

This error by the Commission is one of law. It is the erroneous application of the standards set by the Supreme Court for the determination of "in-line" prices.

It would seem to be unnecessary to dwell on the importance of the Commission's determination of "in-line" prices, as the delays which are necessarily inherent in their determination and in any subsequent determination of just and reasonable rates are obvious. The period under consideration in these consolidated cases begins in 1960, and the case concerns certificates covering some 31,500,000 M.c.f. per year. It is apparent that the prices so established will remain in effect for many years, and consequently large quantities of gas will be sold under any determination of "in-line" prices by the Commission. The Supreme Court, in Atlantic Refining Co. v. Public Service Comm'n, 360 U.S. 378, 79 S.Ct. 1246, referred to the "inordinate delay presently existing in the processing of § 5 proceedings, * * *" and again in the same case to " * * * the delay incident to determination in § 5 proceedings through which initial certificated rates are reviewable appears well nigh interminable." These prices have in reality become more than a mere interim device, especially when coupled with moratoriums which may be imposed by the Commission.

Thus the importance of the "in-line" determination of the price additive to public convenience and necessity becomes all the greater. The Commission's methods and the evidence used to support its findings must be more closely scrutinized.

Thus I would conclude that the Commission committed an error in law in applying the wrong standards for its determination of 16 cents as the "in-line" price in this case. This was selected, as the Commission states, as the lowest price, and I would remand the case for a determination not of the lowest price and not of the highest price, but of the "in-line" price.

On a somewhat different point I also disagree with the majority. Reference is made in the majority opinion to Superior Oil Co. Opinion No. 437, 32 F.P.C. 241, and there is adopted a rule that the "in-line" price once established is presumed to continue until "substantial evidence is presented that it has changed." If this means that some sort of a presumption attaches to prior "in-line" prices which must be overcome, I disagree.

The authorities demonstrate clearly that the "in-line" price is to be determined on the basis of contemporaneous certificates, contracts, and price data. This necessarily contemplates the possibility of change from time to time in either direction. Sohio Petroleum Co. v. Federal Power Comm'n, 298 F.2d 465 (10th Cir.). Once an "in-line" price is established, it continues for those bound until *formally* changed but this does not necessarily mean that a presumption attaches to a previous "in-line" price which must be overcome by any greater weight of evidence than would be required had no "in-line" price been established. There is no basis in the statutes for a presumption or continuing weight to be given to a prior determination in another proceeding. By definition the "in-line" price is what then prevails and not what has prevailed in the past nor influenced by what has prevailed in the past. Whether the change is large or small should of itself make no difference in the determination; the changes from time to time should freely come about, based upon conditions as they may then exist.