**UNITED GAS IMPROVEMENT COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**No. 16692.**

United States Court of Appeals Ninth Circuit.

Oct. 31, 1960.

Rehearing Denied Dec. 7, 1960.

J. David Mann, Jr., John E. Holtzinger, Jr., William W. Ross, Washington, D. C.,

William E. Zeiter, Philadelphia, Pa. (Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel), for United Gas Improvement Company.

Kent H. Brown, Albany, N. Y. (Barbara M. Suchow, New York City, of counsel), for Public Service Commission of New York.

W. O. Crain, Shreveport, La., C. Huffman Lewis, Vernon W. Woods, Shreveport, La. for United Gas Pipe Line Company.

Justin R. Wolf, Charles A. Case, Jr., Washington, D. C. (Lucius M. Lamar, Woollen H. Walshe, New Orleans, La., of counsel), for California Company.

Willard W. Gatchell, General Counsel, Howard E. Wahrenbrock, Solicitor, Robert L. Russell, Asst. General Counsel, David J. Bardin, Washington, D. C., for respondent, Federal Power Commission.

Before BARNES and HAMLEY, Circuit Judges, and FOLEY, District Judge.

HAMLEY, Circuit Judge.

Under review in this proceeding is a Federal Power Commission order granting certificates of public convenience and necessity enabling two producers of natural gas to sell their product to a natural gas pipeline company. The two producers are The Superior Oil Company (Superior) and The California Company (California), both of which are lessees of natural gas fields in Louisiana. The gas is to be sold to United Gas Pipe Line Company (United) which is engaged in purchasing natural gas and thereafter transporting and selling it in interstate commerce.

The petition to review was filed by The United Gas Improvement Company (UGI), operator of the municipally-owned gas works of the City of Philadelphia. United, Superior, California, and the Public Service Commission of the State of New York (New York) have intervened in this court. The City of Philadelphia has filed an amicus curiae brief.

On July 21, 1958, California and United entered into a contract for the sale

and purchase of natural gas produced under a lease held by California in the Bayou Penchant Field, Terrebonne Parish, Louisiana. On September 8, 1958, Superior entered into a similar contract with United relating to natural gas produced from certain leaseholds and interests in leaseholds held by Superior in the Bayou Penchant, Palmetto Bayou, and Four Isle Dome Fields, Terrebonne Parish, Louisiana. These gas purchase contracts considered together, are for the sale during a term of twenty years of an estimated total of 636 billion cubic feet of reserves. Each contract provides for an initial "base" price of 21.5 cents per Mcf plus 2.3 cents per Mcf tax reimbursement, or a total initial price of 23.8 cents per Mcf.[1]

By virtue of section 7(c) of the Natural Gas Act (Act), 15 U.S.C.A. § 717f (c), it was necessary for Superior and California to obtain from the Commission certificates of public convenience and necessity authorizing them to sell this gas to United. Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035. Both companies applied for such certificates. It was also necessary that United obtain such a certificate authorizing it to construct and operate certain lateral supply facilities required for receiving the gas to be purchased under these contracts.

The three applications were consolidated for hearing and disposition by the Commission. The hearing was held and concluded on March 17, 1959, before a Commission hearing examiner. UGI and New York were interveners in that proceeding. On April 16, 1959, the examiner issued his findings and conclusion along with his decision and order that the certificates be issued as applied for with no conditions attached. 22 F.P.C. 252, 256.

Exceptions to the examiner's decision were filed by UGI. These exceptions were considered and in substance denied by the Commission in a decision and order dated August 10, 1959, and it was ordered that the certificates be issued. 22 F.P.C. 252. UGI and New York filed separate petitions for rehearing. These petitions were denied by the Commission on October 7, 1959. This review proceeding was then instituted.

The quarrel which UGI and New York have with the Commission order is that it has the effect of establishing higher initial producer prices than they believe are warranted.

It is provided in section 7(e) of the Act that a certificate of the kind here in question shall be issued if among other things the proposed sale or construction "is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied." Under this provision the Commission is vested with control over the conditions under which gas may be initially dedicated to interstate use.

■ Among the conditions thus subject to control are those which relate to the initial price proposed to be charged and paid. This does not mean that before certificating such a sale the Commission must determine that the proposed initial price is just and reasonable. It does mean that there should be by the Commission "a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7." Atlantic Refining Co. v. Public Service Commission (Catco), 360 U.S. 378, 391, 79 S.Ct. 1246, 1255, 3 L.Ed.2d 1312.

The court in Catco stated the circumstances under which a "responsible reaction" to an initial price proposal

---

1. In each contract the initial base price is to govern until March 1, 1963. The base price is then to be 23.5 cents per Mcf for the next four years, 25.5 cents for the next succeeding four-year period, 27.5 cents for the third four-year period, and 29.5 cents during the remaining period of the contract. The price specified for any of these subsequent periods is subject to redetermination according to a formula and procedures set out in the contracts. It is also provided that in the event taxes are imposed in excess of the rate of 2.3 cents per Mcf, United will reimburse Superior and California for three fourths of the amount of such tax increase.

would preclude the granting of a permanent and unconditional certificate. "* * * Where the application on its face or on presentation of evidence signals the existence of a situation that probably would not be in the public interest," the court said, "a permanent certificate should not be issued." 360 U.S. at page 391, 79 S.Ct. at page 1255. Such a situation would exist, the court indicated, where the proposed price is not in keeping with the public interest

"* * * because it is out of line or because its approval might result in a triggering of general price rises or an increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise." Id.

■ In this event, the court stated, the Commission might in its discretion grant a certificate subject to "such conditions as it believes necessary." 360 U.S. at page 391, 79 S.Ct. at page 1255. It follows that ordinarily when the proposed initial price signals the existence of such a situation, a certificate should not be issued or if issued appropriate conditions should be attached.

We say "ordinarily" because in Texas Gas Transmission Corp., 22 F.P.C. 378, review pending, sub nom. Public Service Commission v. Federal Power Commission, No. 15461 (CADC), the Commission properly refers to circumstances under which an unconditional and permanent certificate might be issued notwithstanding the fact that the proposed price is out of line. Said the Commission:

"* * * We shall consider any new application based upon a price

in excess of any price we have heretofore certificated to be 'out of line' and shall require conclusive proof from the applicant that the public convenience and necessity requires certification at that price." [2] Id. at 388.

■ In the case before us the certificates were ordered to be issued in permanent form and without price conditions. In the light of Catco this was warranted in so far as prices are concerned only if the Commission found on substantial evidence (1) that the proposed initial rates were not "out of line" as the Supreme Court used those words, or that if "out of line" the public convenience and necessity of certifying at those rates had been established, and (2) that their approval would not result in a "triggering" of general price rises or an increase of the applicants' existing rates.

We turn first to the "out of line" factor. In its order of August 10, 1959, the Commission concluded that the proposed initial prices of Superior and California in this proceeding are not out of line.[3] Thus the Commission never reached the question of whether prices which were out of line were nevertheless consonant with the public convenience and necessity.

UGI and New York challenge the Commission's ruling on two grounds: (1) The Commission misconceived what the court in Catco meant by the "line"; (2) assuming that the Commission properly construed that term, the record does not

2. It is apparently with reference to this principle that the Commission states in its brief:

"Where a proposed price is 'in line' a certificate issues on a minimal showing; where, however, the price is 'out of line' the applicant must make an extensive demonstration in support of his rate, else he suffers a certificate denial or a price reduction."

3. What the Commission said was: "Considering whether the price is out of line under Catco, the facts support the conclusion that Sun's price is not out of line * * *." The reference to "Sun's"

price is an apparent inadvertence, the intended reference being to Superior's and California's prices. An order involving the same issue, in which Sun Oil Company was the applicant, was entered on the same day. Sun Oil Company, 22 F.P.C. 351.

The hearing examiner had made no finding as to whether Superior's or California's proposed prices were out of line. The reason for this is that the decision in Catco, which first discussed that consideration, was not handed down until after the hearing examiner had issued his decision.

support the finding that the initial prices here proposed hold the line.

UGI and New York advance several reasons why in their opinion the criteria applied by the Commission evidence a misconception of what the court in Catco meant by the "line." One such reason is that the Commission predicated the price line upon comparative prices paid by pipeline companies in the area rather than upon prices paid by the applicant pipeline company.

That this was the principal criterion employed, with some special consideration of tax reimbursement provisions and the competitive situation, is indicated by this statement contained in the Commission order under review:

"Considering whether the price is out of line under Catco, the facts support the conclusion that Sun's [sic] price is not out of line on a comparative basis. Much south Louisiana gas is today being sold at 21.5 cents per Mcf plus tax reimbursement. Numerous other pipeline companies compete in this general area, and a number of 21.5-cent contracts have been executed. Although the price proposed by The California Company and Superior in this case involves greater tax reimbursement than some other 21.5-cent sales, in our opinion this greater tax reimbursement is justified by the factors present, including the size of these reserves, their accessibility to United's Pipeline, and the need of United to offer some additional price incentive in order to secure the volumes of gas in question.

"The facts disclose that there were several prospective purchasers for this gas in addition to United, and that several offers were made to both The California Company and Superior for this gas. At least one such offer was at the same price United offered, but The California Company accepted United's offer, primarily because it preferred the 'take' provisions of United's contract. Superior preferred the United offer because there would be less delay in making deliveries." 22 F.P.C. 252, 254–55.

In Catco the proposals concerned a portion of the outer continental shelf where the applicant pipeline company, Tennessee Gas Transmission Company (Tennessee), had no other contracts. Likewise, except for some contracts involving smaller reserves and smaller future potentials, no other pipeline company held any contracts in that area. In the absence of any comparative prices in the outer continental shelf area [4] the court in Catco took notice of prices paid by Tennessee in another offshore area, the weighted average cost of gas to Tennessee in all areas, and prices paid by Tennessee in Southern Louisiana. These other prices were substantially below the proposed initial rate in Catco, and the court found nothing in the record to justify the increase. It was therefore held that there was insufficient evidence to support a finding of public convenience and necessity prerequisite to the issuance of a permanent certificate.

The public has an interest in both obtaining reasonable rates and the expeditious dedication of needed new gas reserves. The first such interest is accentuated when as here producer prices have been advancing from plateau to plateau without regulatory supervision. The second such interest would be adversely affected by the lengthy delays occasioned if disposition of certificate applications must await formal adjudication of proposed initial rates.

The "hold the line" technique spelled out in Catco is a stopgap device designed to meet the need created by this combination of circumstances in a manner as

4. In our view the reference in Catco to the applicant pipeline company's other prices does not imply a ruling that under other circumstances prices paid by other pipeline companies in the same area may not be used for comparative purposes in setting a price line.

simple, direct and effective as possible. Its function is to afford standby protection to the public pending normal rate adjudicatory proceedings while enabling the Commission to act upon certificate applications with reasonable dispatch.

■ Considered in this light, the "line" referred to in Catco may properly be referenced to relevant existing producer prices under which substantial amounts of natural gas move in interstate commerce. Where some or all of the relevant producer prices are those paid by other pipeline companies it is especially important that they be consulted for comparative purposes. Otherwise an applicant pipeline company would be bound to a line established by its own past prices. In that event it would not be able to contract for new reserves in competition with pipeline companies whose existing prices would warrant a higher line. Where there are no relevant existing producer prices with which a price proposal may be compared, Catco indicates the best criterion of a proper price line may be the applicant's prices elsewhere, qualified where necessary by substantial evidence explaining price differentials.

■ Existing producer prices are relevant for comparative purposes only if they pertain to gas production in the same or an analogous area and if other principal features of the contracts are fairly comparable. Thus the contracts should be comparable from the standpoint of gas reserves and future potentials. The significance of any disparities existing as to these conditions should be explained by Commission findings based upon substantial evidence. Substantial variation in the quality of gas sold should be similarly treated. The Commission followed this course in Transwestern Pipeline Co. et al., 22 F.P.C. 391. Disparate provisions relative to facilities to be provided and other services to be rendered should be given effect as well in determining the propriety of the analogy to rates under other existing contracts.

■ In our view, however, a determination of relevancy for comparative purposes does not require examination into factors such as relative production costs which are not reflected in specific terms of the contracts. If this were required to implement the "hold the line" technique, the procedure would assume much of the complexity of a rate adjudication. This would tend to defeat the objective of providing simple, direct and effective stopgap protection for the consuming public. Where there are no producer prices which are otherwise comparable and resort must be had to other criteria, however, relative production costs, need, competition between pipeline companies, and no doubt other factors become significant.

From all that is said above it will also be understood that we find without merit the contention that the price line must necessarily accord with the pre-Catco line. We agree with the view expressed by the Commission in Texas Gas Transmission Corporation et al., 22 F.P.C. 378, 388, that factors such as increased production costs since Catco, comparative accessibility of field locations, and comparative depth of sands tend to make pre-Catco prices irrelevant for comparative purposes in other cases.

UGI and New York further contend, however, that if the prices paid by other pipeline companies may be resorted to for comparative purposes, such comparison must at least be limited to prices which have been authorized only after the Commission's careful scrutiny according to Catco standards. It is argued that until it is demonstrated that such other prices have themselves been justified in certificate proceedings or tested in rate proceedings "they are absolutely meaningless as a touchstone."

The Commission points out that in utilizing price comparisons for the purpose of drawing a "line" the Commission has limited itself to a consideration of certificated prices. It nevertheless concedes that these certificated prices for the most part have never been subjected to Commission scrutiny. But, the Commission argues in effect, such a limitation is neither expressed nor implied in the Cat-

co decision, and to impose such a limitation would render the whole technique impractical.

As previously indicated, the price line is intended to reflect current conditions in the industry. Therefore, comparative prices upon which it is based must be prices under which a substantial amount of natural gas presently moves in interstate commerce. The limitation urged by UGI could well defeat this objective by restricting the comparison to a small number of contracts under which little gas moves today. It could, in fact, require a rollback to prices having no current relevancy.[5]

■ Assuming the criteria employed by the Commission to be otherwise acceptable, we hold that the consideration for comparative purposes of producer prices not previously scrutinized does not evidence an abuse of discretion.

■ A third criticism which is leveled against the criteria employed in fixing a price line is that the Commission sanctions the use for comparative purposes of prices which are under review in pending court and Commission proceedings.

This objection is not raised as an abstract proposition. UGI contends that of the forty-seven producer price schedules upon which the Commission may have relied in fixing the line at 21.5 cents per Mcf (basic rate) in this case [6], four such schedules established in Trunk Line Gas Company et al., 22 F.P.C. 110, were and are under review in the Court of Appeals for the District of Columbia. Another

thirty-one of these forty-seven schedules, UGI asserts, are presently under re-examination by the Commission in the Transco-Seaboard certificate case.[7]

When an order certificating an initial rate is under court or Commission review, it is possible that the certificate may be eventually denied or price conditions may be attached. In our opinion an existing rate subject to such a hazard does not provide a reasonably reliable basis upon which to predicate a price line. In the event the existing rate is later modified or conditioned as a result of the pending proceedings the foundation of the line derived therefrom would be undermined. Moreover, the acceptance of questioned existing prices as a guide in setting the line might itself have the anomalous effect of creating a standard by which the questioned rates would then be judged.

For the reasons indicated we are of the opinion that it would be an abuse of discretion for the Commission in establishing a price line to rely upon producer prices which are under such a cloud.

■ We go further and express the view that where a substantial number of certificated prices are thus under court or Commission review, like prices in the same area though not currently under review ought to be regarded as suspect. In such circumstances it would seem that such similar prices ought not to be relied upon in fixing a line except upon evidence and findings to the effect that they are not subject to the same infirmities which

5. The Commission points out that virtually none of the south Louisiana prices have been scrutinized in rate or certificate proceedings.

6. The Commission order and the record on which it is based do not reveal what producer price schedules were relied upon in fixing the line at 21.5 cents. In an appendix to the Commission's brief in this court there are listed forty-seven certificated schedules on file with the Commission prior to August 10, 1959, in which an initial price of 21.5 cents or more was specified. It is stated in the appendix that this list "is not exhaustive." It is not represented in the Com-

mission's brief that these are the actual schedules relied upon by the Commission in its order of August 10, 1959.

7. Public Service Commission of New York v. Federal Power Commission et al., 361 U.S. 195, 197, 80 S.Ct. 292, 4 L.Ed. 2d 237, reversing United Gas Improvement Company v. Federal Power Commission, 3 Cir., 269 F.2d 865, with directions to remand to the Federal Power Commission "for reconsideration and redetermination in the light of Atlantic Refining Co. v. Public Service Commission of New York (Catco), 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312."

are under test in the pending proceedings.

■ It is next contended that the technique used by the Commission sanctions the use for comparative purposes of prices scrutinized by the Commission in other proceedings in which a party to the current proceedings was denied the right to participate.

Here again the objection is not abstract, but is directed to circumstances existing in this case. Of the forty-seven producer price schedules referred to in footnote 6, UGI asserts that sixteen schedules were certified in four proceedings in which UGI and New York were denied the right to participate. Denial of the right to participate was apparently on the ground that UGI and New York were not interested in those proceedings. The proceedings involved producer sales of gas destined for resale in parts of the country where UGI has no facilities and New York has no jurisdiction.[8]

Where such a denial of the right to participate in prior proceedings has not been judicially challenged, the fact of denial should not preclude the Commission from referring to the initial price therein certified in the process of fixing a line in a subsequent proceeding. This is true because if not judicially challenged a Commission order excluding participation by others must be taken as correct.

Where, however, denial of the right to intervene in the earlier proceedings is being questioned in the courts, the rate schedule certificated in that proceeding ought not to be so utilized. We have heretofore stated the reasons why prices established in an order subject to a pending court review ought not to be considered in fixing a price line.

■ Another objection advanced against the Commission's manner of proceeding is based on the fact that outstanding contracts deal in a variety of ways with the matter of tax reimbursement. Because of this variety of treatment, it is contended, prices accepted for comparative purposes should include the tax reimbursement feature.

In determining that the initial prices proposed by Superior and California were not out of line the Commission considered only the base price of 21.5 cents per Mcf and did not include the 2.3 cents per Mcf tax-reimbursement feature. Considering only the base rate, the Commission was able to say that it was not out of line with the other basic rate schedules upon which it must have relied. Had it considered the total initial price, including tax reimbursement, however, the Commission could not have made that statement.[9]

The Commission correctly points out that the taxes paid by a producer represent out-of-pocket cost. Hence reimbursement for such taxes does not in and of itself represent gain by the producer. The right of recoupment of a volumetric tax cost is established in Commission practice.

The fact remains, however, as the Commission concedes, that tax reimbursement is an item for bargaining between producer and pipeline company. As a result of such bargaining one pipeline company may agree to a 21.5-cent initial price but

8. See, for example, Trunkline Gas Company, et al., 22 F.P.C. 110, order issued on July 22, 1959, and opinion of Commissioner Connole dissenting therein. As previously noted, the order entered in this proceeding involving four of the rate schedules which are listed in the appendix to the Commissioner's brief is under review in the Court of Appeals for the District of Columbia.

9. This is made clear in the hearing examiner's decision stating:
   " * * * Each contract provides for an initial 'base' price of 21.5¢ per Mcf plus 2.3¢ per Mcf tax reimbursement, or a total initial price of 23.8¢ per Mcf. This total price is 0.25¢ per Mcf higher than any at which a sale has been certificated by the Commission in South Louisiana. There are other sales which have been certificated at the same 'base' price; but no other involves a contract which calls for this 'base' price plus a tax reimbursement of as much as 2.3¢, which is the total tax at the present time." 22 F.P.C. 252, 257.

only partial reimbursement for taxes. In another contract (the instant case, for example) a pipeline company may obtain the same initial price but in order to do so may have to agree to full reimbursement for taxes at present rates. It is apparent that the second producer has obtained a better price than the first one, for it has been able to pass along all of its volumetric tax costs as a separate item.

It follows from this, we believe, that comparative tax reimbursement plans as well as comparative base rates ought to be taken into consideration in determining whether a proposed initial price is out of line. Except where the difference in tax reimbursement features is relatively insubstantial, it is our opinion that failure to take account of such a difference would be an abuse of discretion.

Summarizing on this branch of the case, we are of the view that with respect to the use for comparative purposes of prices presently under review and the failure to consider tax reimbursement features in making such comparisons, the criteria employed by the Commission in fixing a line by which to test the proposed initial rates of Superior and California fall short of what is required under Catco and the Act. Since it was apparently upon the basis of a line so determined that the Commission ordered issuance of a permanent and unconditional (as to prices) certificate, we hold that the Commission abused its discretion in so doing and that the order must be set aside.

In view of the conclusion just stated it is not necessary to deal at length with the other arguments which have been advanced by UGI and New York. Since, however, further proceedings before the Commission will now be required, we briefly state our views on other questions which the Commission must again face.

Concerning the adequacy of the evidence to support the Commission findings, it is to be remembered that this is not a rate proceeding. Hence a comprehensive showing such as would therein be required is not necessary. Nevertheless, where the Commission relies upon existing certificated rates in establishing a line, evidence ought to be submitted concerning those rates. The contracts ought to be identified, and each should be subject to test as to arms-length bargaining, identity or similarity of gas production area, nature of gas reserves, quality of gas, facilities to be provided and services to be performed.

With regard to the factor of triggering of price increases, we find nothing wrong with the Commission finding that United's other contracts will not be substantially affected. They contain no "favored nation" clauses. The testimony as to a noncontractual "favored nation" policy concerning one customer does not seem to us of sufficient importance to undermine the Commission's finding. In any event the petitions for rehearing did not raise this question. Hence, in view of section 19(b) of the Act the point may not be raised here. Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 324 U.S. 635, 649, 651, 65 S.Ct. 821, 89 L.Ed. 1241.

The Catco decision in discussing "triggering" refers not alone to possible increases in the applicant's rates, but to possible "general price rises." The Commission order appears to contain no finding as to whether the proposed initial prices might result in a triggering of general price rises.

The Commission order is vacated and the matter is remanded to the Commission for further proceedings consistent with this opinion.