PAN AMERICAN PETROLEUM CORPO-
RATION, E. Cockrell, Jr., Continental
Oil Company, Freeport Sulphur Com-
pany, General American Oil Company
of Texas, J. Ray McDermott & Co., Inc.,
Placid Oil Company et al., Shell Oil
Company, the Superior Oil Company,
and U. S. Oil of Louisiana, Inc., Peti-
tioners,

v.

FEDERAL POWER COMMISSION,
Respondent.

Long Island Lighting Company, Philadel-
phia Electric Company, Philadelphia
Gas Works Division of the United Gas
Improvement Company, Public Service
Commission of the State of New York,
Intervenors.

Nos. 7912, 7962, 8115, 8116, 8118,
8119, 8121–8125.

United States Court of Appeals
Tenth Circuit.

March 9, 1967.

Rehearing Denied May 22, 1967.

Harold H. Young, Jr., Tulsa, Okl., for petitioner in Nos. 7912 and 7962, Neal Powers, Jr., Houston, Tex., for petitioners in Nos. 8115, 8118 and 8125, Joseph C. Johnson, Houston, Tex., for petitioner in No. 8116, Cecil E. Munn, Fort Worth, Tex., for petitioner in No. 8119, Paul W. Hicks, Dallas, Tex., for petitioners in No. 8122, Oliver L. Stone, New York City, for petitioner in No. 8123, and Herbert W. Varner, Houston, Tex., for petitioner in No. 8124. With them on the briefs were:

J. P. Hammond, Tulsa, Okl., William P. Hardeman, New Orleans, La., Carroll L. Gilliam, Philip R. Ehrenkranz, and Grove, Jaskiewicz, Gilliam & Putbrese, Washington, D. C., for Pan American Petroleum Corporation, petitioner in Nos. 7912 and 7962.

Cecil N. Cook and Butler, Binion, Rice, Cook & Knapp, Houston, Tex., for E. Cockrell, Jr., Houston, Tex., petitioner in No. 8115, Freeport Sulphur Company, petitioner in No. 8118, and U. S. Oil of Louisiana Inc., petitioner in No. 8125.

Bruce R. Merrill and Thomas H. Burton, Jr., Houston, Tex., for Continental Oil Company, petitioner in No. 8116.

W. P. Barnes, Jere G. Hayes, Dallas, Tex., and Cantey, Hanger, Gooch, Cravens & Scarborough, Fort Worth, Tex., for General American Oil Company of Texas, petitioner in No. 8119.

H. H. Hillyer, Jr., and H. H. Hillyer, III, New Orleans, La., for J. Ray McDermott, Inc., petitioner in No. 8121.

Robert W. Henderson, Dallas, Tex., for Placid Oil Company, Margaret Hunt Hill, Trustee for Hassie Hunt Trust, H. L. Hunt and Hunt Oil Company, petitioners in No. 8122.

Thomas G. Johnson, New York City, for Shell Oil Company, petitioner in No. 8123.

Murray Christian, Houston, Tex., for The Superior Oil Company, petitioner in No. 8124.

Howard E. Wahrenbrock, Washington, D. C., for the respondent. With him on the brief were Richard A. Solomon, General Counsel, Cyril S. Wofsy, Attorney, and Joel Yohalem, Atty., F.P.C.

Before LEWIS, BREITENSTEIN and HILL, Circuit Judges.

### DAVID T. LEWIS, Circuit Judge.

These petitions by independent natural gas producers seek review under section 19(b) of the Natural Gas Act [1] of orders entered by the Federal Power Commission establishing an "in-line" price and other conditions for permanent certificates of public convenience and necessity issued under section 7 of the Act and covering sales of gas in interstate commerce from producing areas in South Louisiana and the adjacent federal domain offshore.[2] Proceedings before the Commission encompassed some 362 separate certificate applications, two-thirds of which were settled and severed before the conclusion of hearings, for a wide variety of gas-sales contracts executed between 1945 and 1963.[3] By its orders the Commission set the "in-line" price, or maximum initial price, at 18.5 cents per Mcf, with an additional 1.5 cents per Mcf for tax reimbursement where the gas is produced within the taxing jurisdiction of Louisiana. Refunds were required, with interest, for amounts in excess of the in-line price previously collected under temporary certificates that contained express provisions for potential refund liability. All permanent certificates that issued were made subject to a moratorium on increased-rate filings above 23.55 cents per Mcf, including tax reimbursement, pending completion of the South Louisiana area rate proceeding or July 1, 1967, whichever is earlier. Finally, for those producers whose temporary certificates contained no refund conditions, the Commission reserved for further consideration the question of whether they would in fact be required to make refunds.

The petitions are before this court by virtue of the fact that Pan American Petroleum Corporation, petitioner in Nos. 7912 and 7962, has its principal place of business within the territorial bounds of this circuit and was the first producer to file for review. The other petitioners are transfers from other circuits. 28 U.S.C. § 2112(a). The four intervenors are parties of record, but upon their election not to file briefs we denied their requests to present oral arguments.

At the hearings below, several producers offered economic and geological evidence which purported to reflect an increase in production costs from those that had prevailed during prior South Louisiana certificate proceedings. The examiner rejected this evidence, the Commission sustained the examiner, and some of the petitioners here have filed motions to adduce. Action on the motions was deferred until completion of arguments on the merits of the orders. We have since held in Sunray DX Oil Co. v. FPC, 10 Cir., 370 F.2d 181, Dec. 9, 1966,[4] that the standards of public convenience and necessity to be applied by the Commission in section 7 proceedings do not compel admission of such evidence. And while circumstances surrounding certifi-

---

1. 15 U.S.C. § 717r(b).

2. Union Texas Petroleum et al., Opinions Nos. 436 and 436–A, reported at 32 F.P.C. 254 and 32 F.P.C. 952.

3. The petitions for review by four producers have been separately considered in

this court. See Continental Oil Co. v. FPC, 10 Cir., 373 F.2d 96, Feb. 10, 1967.

4. References hereinafter to Sunray DX will be to the Dec. 9, 1966 decision of this court, 370 F.2d 181, unless otherwise noted.

cate applications may on occasion dictate consideration of cost factors, these are matters subject in the first instance to Commission expertise and discretion. United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 227, 86 S.Ct. 360, 15 L.Ed.2d 284. Here, as will be discussed, the Commission's orders are based partially upon comparisons between current prices and in-line prices previously established. Concededly, current economic and geological cost evidence could have a substantial effect upon final disposition of the applications. But for purposes of section 7, there is nothing in the record to suggest an abuse of Commission discretion in the rejection of such evidence, and accordingly, the motions to adduce will be denied. We turn then to the substantive content of the orders and the producers' various objections thereto.

## THE IN-LINE PRICE

■■ The origin of the in-line price concept is the landmark CATCO decision, Atlantic Ref. Co. v. Public Service Comm'n of New York, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312, where the Supreme Court admonished the Commission to hold the line on natural gas prices pending determination of just and reasonable rates. Since CATCO, numerous court opinions have attempted to articulate and refine the evidentiary standards and methodology for in-line pricing. See, e. g., United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284; Sunray DX Oil Co. v. FPC, 10 Cir., 370 F.2d 181, Dec. 9, 1966; California Oil Co., Western Div. v. FPC, 10 Cir., 315 F.2d 652; Public Service Comm'n of New York v. FPC, 117 U.S.App.D.C. 287, 329 F.2d 242, cert. denied sub nom. Prado Oil & Gas Co. v. FPC, 377 U.S. 963, 84 S.Ct. 1646, 12 L.Ed.2d 735; United Gas Improvement Co. v. FPC, 9 Cir., 283 F.2d 817, cert.

denied sub nom. Superior Oil Co. v. United Gas Improvement Co., 365 U.S. 879, 81 S.Ct. 1030, 6 L.Ed.2d 191. From these and other authorities, two principles have emerged which more than once have presented the Commission with delicate problems of reconciliation. The first is that the price line must reflect current conditions in the industry and the prices on which the line is based must be those under which substantial quantities of gas presently move in interstate commerce. The second is that the Commission must be suspect of all current prices that are under review in pending court or Commission proceedings or that were arrived at by methods which subsequently have been disapproved in unrelated proceedings.

It was almost impossible for the Commission to adhere fully to both of these principles in the instant proceedings. Because of the substantial number of temporary certificates involved and the recent history of South Louisiana in-line price litigation, the majority of interstate gas volume from the area was moving under suspect prices. In a sense, current conditions in South Louisiana had to be treated as suspect. Under the circumstances, therefore, the Commission looked to the 18.5-cent price line (exclusive of tax reimbursement) that had been established in three previous South Louisiana cases,[5] and adopted the view that, absent sufficient evidence showing the contrary, the old line would be presumed to have continued. All of the three previous decisions involved sales under contracts executed in the period 1956–1959. Absent the severed dockets, the instant case involves sales under contracts executed in the period 1957–1963.

One of the important factors that the Commission had to consider was whether the amendments to its Statement of General Policy No. 61–1, 24 F.P.C. 818,

5. These were: United Gas Pipeline Co., 30 F.P.C. 329, dismissed for lack of venue sub nom. Gulf Oil Corp. v. FPC, 5 Cir., 330 F.2d 824; Placid Oil Co., 30 F.P.C. 283, aff'd sub nom. United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284, reversing 5 Cir., 335 F.2d 1004; and Continental Oil Co., 27 F.P.C. 96 (CATCO on remand). None of these cases involved consolidation of dockets on a scale as great as the instant one.

might have caused a general increase in permanently certificated prices for the South Louisiana area. The Statement established twenty-three geographic rate areas and proposed guideline prices for each area. When originally issued in September 1960, it did not set guidelines for South Louisiana because of pending litigation. On October 25, 1960, however, the Commission issued its First Amendment to the Statement, 24 F.P.C. 902, which fixed the South Louisiana guideline price at 21.5 cents per Mcf exclusive of tax reimbursement. Then on October 31, 1961, the Commission issued its Fourth Amendment to the Statement, 26 F.P.C. 661, which lowered the South Louisiana guideline price to 21.25 cents per Mcf, including tax reimbursement, and set a guideline of 19.5 cents per Mcf for gas produced in the adjacent federal domain offshore. In light of these amendments, the Commission tabulated all recent permanently certificated prices [6] according to four contract periods, viz:

(1) Prior to January 1, 1960, which was covered by the maximum price line (18.5 cents plus 1.5 cents for tax reimbursement where applicable) established in the three previous South Louisiana in-line cases (see note 5 supra);

(2) From January 1, 1960 to October 25, 1960, the date of the First Amendment to Statement of General Policy No. 61–1;

(3) From October 26, 1960 to October 31, 1961, the date of the Fourth Amendment to Statement of General Policy No. 61–1; and

(4) From November 1, 1961 to the end of 1962. The Commission then compared the weighted average permanent-certificate prices with the respective weighted average temporary-certificate prices in each contract period. The only temporary certificates considered were those involved in the instant proceeding. The findings and conclusions of the Commission may be summarized as follows:

For the calendar years in the first contract period, the weighted average price, including tax reimbursement, varied from 20.8814 cents to 21.8988 cents under permanent certificates and from 19.5573 cents to 22.2080 cents under applicable temporary certificates. Since these figures corresponded closely with the evidence on which the three prior in-line determinations were based, the Commission concluded that there was no reason to depart from the line that those cases had established.

For the second contract period, the weighted average price, including tax reimbursement, was 21.767 cents under permanent certificates and 22.76 cents under applicable temporary certificates. It was also found, however, that almost two-thirds of the permanently certificated volume for the period moved at 23.25 cents, a figure that was approved when the Commission was applying pricing standards in certificate cases which have since been disapproved by the courts. But rather than ignore altogether this unusually high price, the Commission simply observed that the weighted average price for permanently certificated sales was within the limits of the pre-1960 weighted average prices and concluded that the price line had not changed.[7]

For contracts falling in the period between issuance of the two guideline prices, the weighted average price, including tax reimbursement, was 17.148 cents under permanent certificates and 21.25 cents under applicable temporary certificates. Here, however, temporary volumes outweighed permanent volumes by almost four to one. For contracts dated after issuance of the second guideline price, or the fourth period, the weighted average price, including tax re-

6. Apparently all other price sources, including settlement agreements, were deemed suspect.

7. If we ignore the sales at 23.25 cents, as the Commission could have done under the suspect-price doctrine, the weighted average price under permanent certificates for the second contract period would be 19.32 cents, including tax reimbursement.

imbursement, was 15.0194 cents under permanent certificates and 20.87 cents under temporary certificates. But here temporary volumes outweighed permanent volumes by more than nine to one and, in addition, the weighted average price for permanent certificates was quite distorted by an extremely low-priced sale at 10.75 cents. In view of the relatively few permanently certificated sales in these last two periods and the distortion caused by the one substantial low-priced sale, the Commission concluded that the marked decline in weighted average prices from those of the first two periods did not warrant a reduction of the previously established in-line price. Accordingly, the Commission ordered that for sales subject to the taxing jurisdiction of Louisiana, the price line would be held at 18.5 cents plus 1.5 cents for tax reimbursement.

No permanent certificates and only eight temporary certificates were issued for sales from the adjacent federal domain during the three periods subsequent to January 1, 1960. The weighted average prices under the temporary certificates were 21.5 cents for the second period and 19.5 cents for the third and fourth periods. The Commission concluded that these few sales were insufficient to show a change in the previous 18.5-cent price line for that offshore area.

█ Petitioners' threshold argument is that the findings and conclusions of the Commission are not supported by substantial evidence. To the contrary, we think the record shows commendable diligence in the presentation to the parties and to the court of the analytical approach, computation methods, and relevant data which led to the results reached. We further think that the conclusions relating to the 18.5-cent price line based upon the record findings are clearly reasonable.

█ Petitioners suggest that the price line has been subjectively pre-determined by reference to the three previous South Louisiana cases, and since some of the petitioners were not parties to those oth-

er proceedings, it is contended that they have been denied procedural due process. While such an argument has merit when considered in the abstract, it here does no more than beg the question. The Commission was careful to explain that although the previously established in-line price would be presumed to continue, it would be used simply as a point of departure in analyzing the more recent price evidence. In the end, it was demonstrated that, if anything, prices had declined rather than increased since the determination of the earlier price lines. The determination made here cannot be held invalid just because it is premised in part upon a comparison of current prices with earlier prices.

Petitioners next urge that the Commission erred in failing to give greater weight to the relatively large volumes of gas moving at prices in excess of 18.5 cents. In effect, they accuse the Commission of having applied the suspect-price doctrine in such a manner that it became mathematically impossible not to freeze the results to old price lines that had no current relevancy. We note that in Placid Oil Co., 30 F.P.C. 283, aff'd sub nom. United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284, reversing 5 Cir., 335 F.2d 1004, the Commission eliminated all sales in excess of 18.5 cents even though such sales, both numerically and volumetrically, represented well over half of the interstate total. The Supreme Court held that the 18.5-cent line was supported by the record. Here, in contrast to the *Callery* case, all permanently certificated sales, those above 18.5 cents as well as those below, were reflected in the Commission's computations. And although some of the computations were distorted by two permanent certificates at 23.25 cents and one permanent certificate at 10.75 cents, it is clear that neither the high-priced nor the low-priced sales were ignored or eliminated from consideration.

██ Petitioners also complain about the use of weighted averages to arrive at ceiling prices. Naturally, average

prices are lower than the highest prices paid. As a matter of mathematical simplicity, however, there is nothing wrong with using weighted averages to compare one set of numbers with another. As we stated in the *Sunray DX* case, supra, a comparison of weighted average prices is proper so long as it is not arbitrary and capricious. We find nothing arbitrary or capricious about the procedure followed here. In *Sunray DX* the Commission concluded that the in-line price should be raised while here it concluded that it should remain unchanged. But different results cannot condemn the method used.

Petitioners' final contention aimed at the in-line price issue is that the guideline prices established by the First and Fourth Amendments to Statement of General Policy No. 61–1 should be presumed to represent in-line prices from the points of view of producers. Our position on this question has already been set out in the *Sunday DX* opinion, and a full restatement of that position here is unnecessary. Whatever reliance producers might have placed on the guideline prices, that reliance cannot be traced to any misleading statements by the Commission. Guideline prices are, and were here, issued *ex parte*, without opportunity for a hearing as required by section 7, and not subject to judicial review. State of Wisconsin v. FPC, 110 U.S.App.D.C. 260, 292 F.2d 753. It cannot be seriously contended that they represented equivalents to the in-line prices required by CATCO for the issuance of permanent certificates of public convenience and necessity. Public Service Comm'n of New York v. FPC, 117 U.S. App.D.C. 287, 329 F.2d 242 cert. denied sub nom. Prado Oil & Gas Co. v. FPC, 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735. We reiterate that having once established guideline prices the Commission could not totally ignore their effect on the in-line price. But here, as in *Sunray DX*, their effect was thoroughly evaluated.

In summation, we find that the Commission has approached the instant case with full appreciation for its importance to the producers as well as to the consumer. Aside from the deference we owe Commission expertise, People of State of California v. FPC, 9 Cir., 353 F.2d 16, 23, we are satisfied that the record evidence amply supports all of the substantive conclusions pertaining to the in-line price of 18.5 cents. We reach this conclusion, as we have indicated, in reliance upon the soundness of our earlier decision in *Sunray DX*. The District of Columbia Circuit has had recent occasion to refuse acceptance of some aspects of our reasoning in *Sunray DX*, although tacitly recognizing, as did we, that evidentiary standards must of necessity not be so inflexible as to frustrate the already-complex administration of the Natural Gas Act. Public Service Comm'n of New York v. FPC, D.C.Cir., 373 F.2d 816, Feb. 7, 1967. We do not believe that the simple purpose of a section 7 proceeding is to protect the consumer against exploitation pending determination of a just and reasonable rate. But see Public Service Comm'n of New York v. FPC, supra at p. 829 of 373 F.2d. The general purpose of the Act is to protect the consumer, but section 7 proceedings, as well as other proceedings in the administration of the Act, must consider and attempt to obtain a balance between the interests of consumer, producer and all others whose interests fall between. The task is difficult, but experience has gradually attached more than lip-service significance to administrative expertise. Temporary certificates are now conditioned rather than perfunctorily granted. Contract prices have made some adjustment in view of the inescapable captured market of regulation. The establishment of guidelines is a considered administrative function. Settlement agreements are a recognized and judicially encouraged instrument to provide both a semblance of price stability to producers and to mitigate against delay to the consumer interests. See generally Continental Oil Co. v. FPC, 10 Cir., 373 F.2d 96, Feb. 10, 1967; Skelly Oil Co. v. FPC, 10 Cir., 375 F.2d 6 (Permian Basin), Jan. 20, 1967. We consider each of these procedural and background incidents to have

proper evidentiary significance in a section 7 proceeding to be weighed by the Commission against the impact of more probative evidence such as permanent certificates in its determination of in-line prices. The rejection of economic and geological evidence, although not necessarily unrelated to current conditions, may be required for practical reasons. See United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284.

## TAX REIMBURSEMENT

Although we affirm the Commission's conclusions that the previously established 18.5-cent price line had not changed over the four contract periods, we find no support for the rather summary treatment of the 1.5-cent additional allowance for tax reimbursement where the gas is sold subject to the taxing jurisdiction of Louisiana. In United Gas Improvement Co. v. FPC, 9 Cir., 283 F.2d 817, 826, cert. denied sub nom. Superior Oil Co. v. United Gas Improvement Co., 365 U.S. 881, 81 S.Ct. 1030, 6 L.Ed.2d 191, it was held:

> "[C]omparative tax reimbursement plans as well as comparative base rates ought to be taken into consideration in determining whether a proposed initial price is out of line. Except where the difference in tax reimbursement features is relatively insubstantial, it is our opinion that failure to take account of such a difference would be an abuse of discretion."

During most of the contract period covered by the three prior South Louisiana in-line cases, the State of Louisiana imposed a severance tax on natural gas production of 1.5 cents per Mcf. In August 1958, an additional "gathering" tax of one cent was added, but its collection was suspended on November 30 of the same year when the tax was challenged as unconstitutional.[8] In lieu thereof, on December 1, 1958, the severance tax was simply increased by one cent to 2.5 cents per Mcf. See generally Pan American Petroleum Corp. v. FPC, 116 U.S.App.D.C. 249, 322 F.2d 999. The reimbursement in the three prior cases was of course 1.5 cents, reflecting the full amount of the state severance tax being collected on the dates of most of the applicable contracts. The same tax reimbursement was given in the instant case without even acknowledging that there had been a change in the tax itself. Under the Ninth Circuit's U.G.I. decision, such action, unsupported by either evidence or logic, would indicate an abuse of discretion.[9]

Not knowing what the tax reimbursement might otherwise be, we are not in a position to determine whether the difference would be "relatively insubstantial." Petitioners have supplied the court with copies of an exhibit showing contract provisions for natural gas sales in South Louisiana from 1954 to 1962. They also refer to other evidence which, they contend, dictates a tax allowance of "at least 1.99¢ and in no event less than 1.8¢ per Mcf." From the collective points of view of the producers in the area, the differences could prove to be quite substantial. These portions of the record, however, have not been certified to us and included in the Joint Appendix, and in any event, it is the Commission that must first address itself to the problem.

**8.** It was ultimately held unconstitutional by the Supreme Court of Louisiana in Bel Oil Corp. v. Fontenot, 238 La. 1002, 117 So.2d 571.

**9.** In the brief and on oral argument, counsel for the Commission stated that the Supreme Court's *Callery* decision had disposed of the problem adversely to the producers. The *Callery* opinion, however, does not mention the propriety of the tax reimbursement, probably because the issue was not even before the Court when the case was originally submitted. The producers briefed the tax-reimbursement problem, along with several other issues, for the first time in their petition for rehearing. The petition was denied without opinion. 382 U.S. 1001, 86 S.Ct. 526, 15 L.Ed.2d 491.

The price conditions ordered by the examiner were:

"(1) 18.5 cents per Mcf if the certificate relates to a sale not subject to the taxing jurisdiction of Louisiana, and (2) 20 cents per Mcf if the certificate relates to a sale subject to Louisiana tax."

And those ordered by the Commission were:

"18.5 cents per Mcf at 15.025 psia, plus reimbursement for Louisiana severance tax, where applicable, of not more than 1.5 cents per Mcf."

Whether the Commission misconstrued the examiner's decision or was purposely emphasizing that the in-line price had not changed from that previously established, the difference between the methods of treatment is important. Both conclusions were based upon comparative contract prices which included tax reimbursement. The examiner ordered a 20-cent price *including* tax reimbursement while the Commission ordered an 18.5-cent price *excluding* tax reimbursement. Obviously, if the unreimbursed severance tax paid by the producers is greater than 1.5 cents, their revenue will be below the Commission-determined base price of 18.5 cents. We find nothing in the record or in the arguments of counsel to justify a reduction of the tax reimbursement allowance below contract amounts. It appears that the pre-1958 contract allowances have been summarily imposed on petitioners, and all history of changes in taxes and contract provisions have been ignored. We therefore remand this issue to the Commission for further consideration.

## THE MORATORIUM

■ Some of the petitioners object to the imposition of a moratorium on new rate filings in excess of 23.55 cents, including tax reimbursement, until final determination of the South Louisiana area rate or July 1, 1967, whichever is

earlier. They contend that this condition in their permanent certificates has no support in the record to show that it is required by public convenience and necessity. This same contention was made about an identical moratorium provision in the *Callery* case, United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed. 2d 284. The Supreme Court there held:

"We think, contrary to the Court of Appeals, that there was ample power under § 7(e) for the Commission to attach these conditions for consumer protection during this interim period * * *.

"The 'in-line' price of 18.5 cents is supported by the contract prices in the south Louisiana area that were not 'suspect,' and the selection of 23.55 cents beyond which a price increase might trigger escalation reflects the Commission's *expertise*." 382 U.S. at 228–229, 86 S.Ct. at 364. (Emphasis by the Court.)

See also FPC v. Texaco, Inc., 377 U.S. 33, 42–43, 84 S.Ct. 1105, 12 L.Ed.2d 112; FPC v. Hunt, 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878. The rationale of these authorities is equally applicable to the conditioning of certificates by Commission-approved take-or-pay provisions, provisions which require no separate consideration at this time. We therefore approve the Commission action on this aspect of the case.

## INTEREST ON REFUNDS

■ The Commission's orders require payment of refunds of amounts previously collected in excess of the in-line price [10] where temporary certificates were issued subject to such refund liability. The orders require further that interest be paid at six percent per annum on excess amounts collected before March 1, 1960 and at seven percent per annum on excess amounts collected thereafter.[11]

---

10. Or in excess of the price floor fixed in certain temporary certificates if the floor is higher than the in-line price.

11. March 1, 1960 is the date of issuance of Order No. 215A, 23 F.P.C. 474, where interest payable on refunds was increased from six to seven percent.

Those petitioners whose temporary certificates did not mention interest on refunds contend that there is neither an equitable basis nor legal authority for this portion of the orders. They insist that interest may commence running only from the date that their refund obligations became liquidated, and then only at a rate which is deemed compensatory. Rodgers v. United States, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3; Billings v. United States, 232 U.S. 261, 34 S.Ct. 421, 58 L.Ed. 596. These arguments, however, ignore the prior case law as it specifically relates to FPC proceedings. In Texaco, Inc. v. FPC, 5 Cir., 290 F.2d 149, 157, and Mississippi River Fuel Corp. v. FPC, 108 U.S.App.D.C. 284, 281 F.2d 919, 927, cert. denied 365 U.S. 827, 81 S.Ct. 712, 5 L.Ed.2d 705, the courts approved orders imposing six percent interest on refunds even though the sellers had no express notice that interest might be required. And in *Callery*, supra, where a seven percent rate was imposed without notice, the Supreme Court stated simply that "the imposition of interest on refunds is not an inappropriate means of preventing unjust enrichment." 382 U.S. at 230, 86 S.Ct. at 364.[12] Here too, we approve the action taken by the Commission.

## REFUNDS UNDER UNCONDITIONED TEMPORARY CERTIFICATES

As in our *Sunray DX* case, petitioners vigorously object to the portion of the Commission's orders that defers for further consideration the questions of whether and to what extent refunds will be required where temporary certificates were issued without express refund conditions. And while, unlike *Sunray DX*, we are not aware of any recent Commission action directing petitioners with unconditioned temporary certificates to make refunds out of the subject sales, we are nevertheless convinced that there is sufficient aggrievement for review at this time. On the authority of the *Skelly* case, Public Service Comm'n of New York v. FPC, 117 U.S.App.D.C. 287, 329 F.2d 242, cert. denied sub nom. Prado Oil & Gas Co. v. FPC, 377 U.S. 963, 84 S.Ct. 1646, 12 L.Ed.2d 735, the Commission has ruled that it has "both the power and the duty to require refunds of amounts collected in excess of the 'in-line' price" even where temporary authorizations are silent as to potential refund liability. Skelly Oil Co., et al., Opinion No. 492, June 1, 1966.[13] Many producers, in reliance upon prior assurances that all of the moneys collected under such authorizations was theirs to keep,[14] have spent or reinvested the pro-

12. Petitioners suggest that they are being discriminated against because in five other recent opinions the Commission set the rate at only 4½ percent. The Commission explains that all of those cases involved situations where, once the amount to be refunded became liquidated, the producers were given the option of holding the fund or depositing it in an escrow "where it would be invested in" short-term government obligations, both pending an order of distribution.

13. See also Sun Oil Co., et al., Opinion No. 502, July 28, 1966; Amerada Petroleum Corp., et al., Opinion No. 501, July 27, 1966; Turnbull & Zoch Drilling Co., et al., Opinion No. 499, July 25, 1966; H. L. Hawkins, et al., Opinion No. 498, July 22, 1966.

14. See FPC Chairman Swidler's published address to the 1961 annual meeting of the American Petroleum Institute. See also

29 F.P.C. 223, 225, where in denying intervenors' motions to impose refund conditions on previously issued unconditioned temporary certificates, a unanimous Commission stated:

"[W]e would be in a position of having induced producers to dedicate their gas to the market upon one set of conditions, and then imposing more stringent conditions upon them. Such a course of action, except under the most extraordinary conditions, would appear to be inconsistent with the Commission's obligation to act upon applications with 'such certainty as to allow the exercise of choice upon (the producer's) part'. Sunray Mid-Continent Oil Company v. F.P.C., C.A.10, 270 F.2d 404. Equally important it would so denature the value of a Commission authorization as to place any reliance upon our actions in this area in serious jeopardy."

ceeds from their sales and would be hard put to find now the substantial amounts necessary for refunds. Inasmuch as the Commission's position on the merits of the issue is firmly established, albeit in opinions not related to this case, the threat of loss to these petitioners is real and imminent, and judicial consideration of their liability need not be postponed. Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 417–421, Sunray DX Oil Co. v. FPC, 10 Cir., 351 F.2d 395, 400; Hinton v. Udall, 124 U.S. App.D.C. 283, 364 F.2d 676, 680.

We held in *Sunray DX* that "refunds may be ordered under § 7 only when a producer contractually undertakes to make such refunds by the acceptance of a temporary certificate containing an express refund condition." [15] We adhere to that decision for purposes of this case and see no reason for duplication here of principles and views already discussed. We shall, however, consider one contention that has been made by the Commission and not covered in the *Sunray DX* opinion. It is that every producer selling gas under an unconditioned temporary certificate should be charged with notice that refunds might be ordered as of the date of the District of Columbia Circuit's *Skelly* decision. From then on, says the Commission, "a producer should have taken steps to protect himself in the event refunds were ordered, and if he failed to do so, he has no equity to plead which will affect his refund obligation." [16] Aside from the fact that the *Skelly* decision could directly affect only the parties involved, we think that at that time producers generally still had every reason to believe that such refunds would not be ordered. The decision said that the Commission has the power to order refunds even though temporary certificates do not warn of

this contingency, that exercise of this power is not necessarily mandatory, but that when the power is not exercised the record must show the equitable considerations involved. When petition for certiorari was filed by producers a very short time after the decision, the Commission filed a brief in opposition stating that "it is entirely possible * * * that the Commission, after reviewing all pertinent factors, will again reach the conclusion that refunds are inappropriate." It is difficult to imagine how a case in this posture could have dictated immediate preparation for a turning away from years of Commission assurances [17] and from what was believed to be settled judicial interpretation. [18]

Both the Commission and the courts have repeatedly acknowledged that stability of prices is one of the great objectives of regulation under the Natural Gas Act. We have been especially mindful of this objective in our consideration of the moratoria on new rate filings and other restrictive conditions in the producers' licenses to sell gas in interstate commerce. It is manifest, however, that price stability is undermined by threats or attempts to fix prices retroactively without prior warning or, even worse, with prior assurances that specifically negate the refund contingency. Such action not only violates fundamental notions of due process, it also defeats a fundamental purpose for which the regulation was created. The Commission has stated that "temporary authorizations are not and could never be a vehicle for assuring such [price] stability by the very method by which they are handled." Skelly Oil Co., et al., Opinion 492, p. 4, June 1, 1966. We emphatically disagree. The very fact that many temporary authorizations now contain refund conditions attests to their

---

15. 370 F.2d at 194. The rule would not apply of course where an unconditioned temporary certificate has not become final and is overturned by a reviewing court. United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 229, 86 S.Ct. 360, 15 L.Ed.2d 284.

16. H. L. Hawkins, et al., Opinion No. 498, p. 3, July 22, 1966.

17. See note 14 supra.

18. Sunray Mid-Continent Oil Co. v. FPC, 10 Cir., 270 F.2d 404, 408–410; cf. FPC v. Hope Natural Gas Co., 320 U.S. 591, 618, 64 S.Ct. 281, 88 L.Ed. 333.

role in holding the line against changing prices. And whatever the method by which temporary authorizations are handled, we consider it unconscionable to impose upon an unwary producer a hidden liability which could very well, had it been originally exposed, have influenced the initial producer decision of whether to dedicate his gas to interstate commerce. The principle of imposing and enforcing a retroactive condition where none exists, if carried to the extreme, could expand to render a fully established section 5 just and reasonable rate totally unstable and always subject to the lurking possibility of refund. The harm is only more apparent in the latter case.

The motions to adduce additional evidence are denied. All cases are remanded to the Commission for further proceedings consistent with this opinion.

## ON PETITIONS FOR REHEARING

### PER CURIAM.

The Federal Power Commission and others petition for rehearing in these cases pointing out to us quite properly that our factual recitation pertaining to the tax reimbursement question contains several misstatements relating to the history of Louisiana's tax structure and the Commission's application thereof in its earlier in-line determinations and further contending, and we believe improperly, that we have totally misconceived the Commission's determination of the amount of the in-line price.

We erroneously stated in the main opinion that an initial severance tax of 1.5 cents per Mcf was increased in 1958 to 2.5 cents. Prior to 1958, the tax imposed by the State of Louisiana on natural gas production was *1.3 cents,*

consisting of a 0.3-cent severance tax and a one-cent gathering tax. In August 1958, the gathering tax was increased to two cents, but when the entire gathering tax was challenged as being unconstitutional, the severance tax was simply increased on December 1, 1958 to *2.3 cents* per Mcf.

Also in the main opinion, we observed that the Commission gave the same tax reimbursement in this case that it had given in the previous in-line cases without even acknowledging that there had been a change in the tax itself. As far as the present record is concerned, this statement is accurate. But we should note that the Commission did in fact acknowledge the change in its earlier in-line decisions, all of which were made after the effective date of the tax increase. Thus, although the contracts in *Continental (CATCO* on remand) [1] and *Placid* [2] were negotiated and executed when the total tax was only 1.3 cents, it appears that the tax reimbursement in those cases reflected the contract allowances in effect at the time of the Commission's decision. In *Continental,* the contracts permitted a tax reimbursement of 1.5 cents which the Commission accepted as "in the public interest and required by the public convenience and necessity." 27 F.P.C. at 594. In *Placid,* the Commission looked to comparable contracts for the same dates containing two-component prices and concluded that there was no reason to provide a tax reimbursement greater than that allowed in *Continental.* [3]

The evidence shows a definite increase in contractual tax reimbursement allowances where the contracts were negotiated and executed after Louisiana in-

---

1. 27 F.P.C. 96, 27 F.P.C. 592.

2. 30 F.P.C. 283, 30 F.P.C. 682, aff'd sub nom. United Gas Improvement Co. v. Callery Properties, Inc., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284.

3. The Commission and the intervenors advise us that footnote 9 of the main opinion is inaccurate where it states that the tax reimbursement question was not be-

fore the Supreme Court when *Callery* was originally submitted. But inasmuch as the Court's opinion does not mention the propriety of the tax reimbursement and accepts without comment the 1.5-cent figure, we find no merit to the argument that the decision is sufficiently broad in scope to dispose of the question as it is presented here.

creased its severance tax.[4] While we do not hold that the producers are necessarily entitled to all of this increase, in absence of a justification in the record for a tax reimbursement below prevailing contract allowances in the area we have no choice but to conclude that the imposition of the *Continental* and *Placid* allowances was arbitrary. The purpose of the remand is to give the Commission an opportunity to show that there was in fact a reasonable basis for its action in this matter.[5]

In our main opinion we pointed out that the trial examiner had recommended an in-line price of 20 cents per Mcf but that the Commission's determinative words were:

"18.5 cents per Mcf at 15.025 psia, plus reimbursement for Louisiana severance tax, where applicable, of not more than 1.5 cents per Mcf."

The Commission now argues that we misread its decision as determining an on-shore price line having two parts: an 18.5-cent base price plus 1.5 cents for tax reimbursement, and urges that the decision set, or meant to set, a total in-line price of 20 cents, including tax reimbursement. This is a complete about-face in reasoning. The Commission's entire presentation in its two opinions, in the brief,[6] and in the transcript of oral arguments before this Court was premised on the finding that the two-component price established in the three previous in-line cases had not changed over four contract periods. It was upon

this premise that we accepted the Commission's findings with respect to the 18.5-cent base price. The inadequacy of the record on tax reimbursement certainly cannot be rationalized simply by turning the amount into an unknown part of a total in-line price. Indeed, a strong argument could be made supporting the desirability of a two-component in-line price as an exercise of the Commission's expertise in anticipation of the potential ease of determining future adjustments in view of tax changes.

 The Commission also infers in its brief on rehearing that we should affirm the decision of the Commission because the allowance of 1.5 cents for tax reimbursement has ample support in the record. But to do so would require this Court to resort to reasoning not advanced nor apparently relied on by the Commission. This we cannot do even though we might subjectively think a remand to border on futility in changing the ultimate results of a case. This Court exhausts its authority when it points out an error to the Commission. *Sunray Mid-Continent Oil Co. v. FPC*, 353 U.S. 944, 77 S.Ct. 792, 1 L.Ed.2d 794.

Except to the extent that we here correct factual errors in our main opinion as specifically noted, the petitions for rehearing, including those of The Superior Oil Company and J. Ray McDermott & Company which re-argue the validity of the basic 18.5-cent price, are severally denied.

4. Contrary to the statement in the main opinion, this evidence was certified to us by the Commission. We failed to notice the certification in sifting out the mass of exhibits and other materials submitted in connection with the case.

5. The contracts in the third in-line case, United Gas Pipeline Co., 30 F.P.C. 329, were executed after the tax increase and called for a tax reimbursement of the full 2.3 cents. The Commission's opinion there is no more enlightening than the one here. It stated simply:

"In conformity with our decisions in *CATCO* [*Continental*] and *Placid* we shall permit Gulf and Tidewater to collect an additional 1.5 cents per Mcf for partial reimbursement of the Louisiana severance tax." 30 F.P.C. at 333.

6. In its original brief the Commission consistently refers to the subject price as "18.5¢ per Mcf (plus a tax reimbursement of 1.5¢ per Mcf for gas produced within the jurisdiction of Louisiana and subject to the Louisiana severance tax)."